*858
 
 OPINION
 

 Per Curiam:
 

 On April 14, 1992, police discovered the body of Kevin Marble in Las Vegas. On the same morning, David Riker and appellant Richard Allan Walker (“Walker”) were apprehended in Barstow, California after crashing a van that Marble had used. On June 21, 1994, a jury convicted Walker of first-degree murder with use of a deadly weapon and robbery with use of a deadly weapon. Walker then filed a motion for a new trial, which was denied. On December 8, 1994, Walker received two consecutive sentences of life without the possibility of parole. Walker appeals from the district court’s judgment of conviction and denial of his motion for a new trial.
 

 STATEMENT OF THE FACTS
 

 On April 14, 1992, at 2:47 a.m., Thomas Harmon (“Harmon”), a Las Vegas Metropolitan Police Department (“LV Metro”) officer, found the body of Kevin Marble (“Marble”) in an alleyway behind Boston Avenue in Las Vegas. The body was lying in a large pool of blood. Footwear impressions from two different sets of shoes appeared in the blood. A survival-type knife lay on the nearby sidewalk. Marble had been stabbed once in the neck and once in the chest.
 

 
 *859
 
 Appellant Richard Allan Walker (“Walker”) was charged with first-degree murder with use of a deadly weapon and robbery with use of a deadly weapon. A jury trial commenced on May 31, 1994.
 

 At trial, John McDonald (“McDonald”) testified that in April 1992, David Riker (“Riker”) and Walker were working for him as “carnies” in Blythe, California. McDonald testified that on April 10, 1992, at approximately 8:00 p.m., Walker quit. Soon thereafter, Riker also quit.
 

 Philip Quinn (“Quinn”), also a carnie, testified that he shared a motel room in Blythe with Riker and Walker. Quinn testified that they had discussed leaving the carnival, and Riker had mentioned going to Las Vegas. Quinn testified that Riker owned a pair of brown or black boots with red laces (the “Colorado boots”), and Walker owned one or two pairs of tennis shoes.
 

 Melvin Bergman (“Bergman”), of the National Oceanic and Atmospheric Administration (“NOAA”), and his crew were also working in Blythe in April 1992. On April 11, 1992, a Suburban van used by the NOAA crew (the “NOAA van”) was stolen. Four days later, when Bergman recovered the NOAA van in Las Vegas, he noticed that parts of it had been spray-painted red. Bergman testified that upon recovery, a survival knife and its sheath were missing from a box in the van. At trial, Bergman identified photographs of the knife and sheath, and noted that the knife was bent in the photographs.
 

 Thomas Thowsen (“Thowsen”), a LV Metro officer, testified that the NOAA van was recovered on South Highland in Las Vegas. Trans Sierra Communications (“TSC”) was located nearby at 3347 South Highland.
 

 Joseph Matvay (“Matvay”), a LV Metro senior crime analyst, testified that the NOAA van appeared to have been spray-painted in an attempt to obliterate latent fingerprints. Matvay identified a fingerprint on the driver’s seat belt buckle as Walker’s, and also found Riker’s fingerprints in the van.
 

 Stephen Glen Kirk (“Kirk”) testified that in April 1992 he was employed by TSC and was Marble’s coworker. Kirk testified that on April 13, 1992, at about 8:30 p.m., Marble came to his house to pick up some keys and an identification card. Marble told Kirk that he was going to the TSC office to work on some blueprints for a school, and then Marble was going home. Kirk identified a van recovered in Barstow as the van Marble drove (the “TSC van”), and identified objects found in the van, including blueprints, keys, and Marble’s wallet.
 

 Kathy Marble, Marble’s wife, testified that Marble’s West Boston Avenue apartment was near the TSC office.
 

 Louis DeFalco (“DeFalco”) testified that in April 1992 he ran
 
 *860
 
 security at the Primadonna Hotel and Whiskey Pete’s at Stateline, Nevada. On April 14, 1992, between 1:20 and 1:30 a.m., he was notified about a confrontation between a drunk white male and a security guard in the parking lot. The white male was near a white van with “RC or TC Communications” printed on the side. DeFalco described the man as clean-shaven and having shoulder-length blondish-brown hair. DeFalco observed the man get into the passenger side of the van, and the van leave the parking lot in a reckless manner. A PBX operator notified the Nevada Highway Patrol and the California Highway Patrol (“CHP”) about the van.
 

 William Flowers (“Flowers”), a CHP officer, testified that at 1:33 a.m. on April 14, 1992, CHP dispatch notified him and his partner, Officer Nester (“Nester”), of a possible drunk driver involved in breaking a car window in the Whiskey Pete’s parking lot. Dispatch said that the driver was a male with long hair and a beard. Flowers and Nester received a second call at 3:16 a.m., when the vehicle passed the agricultural check station. Personnel at the agricultural station had reported that the parties within the van smelled of alcohol, and that a bearded male was passed out in the back of the van. Flowers and Nester saw the van, confirmed the license plate number, and called for assistance to stop the vehicle. Flowers testified that he observed the van weaving within its lane, and stated that drunk drivers display these types of maneuvers due to a lack of coordination. Flowers and Nester followed the van for over six miles before Flowers signalled for it to pull over. Flowers testified that the van accelerated to 90 m.p.h. before it exited at Main Street in Barstow.
 

 Barry Hazelett (“Hazelett”), a Barstow police officer, testified that at 3:27 a.m. he was involved in chasing a TSC van down Main Street in Barstow. The van ultimately crashed into an embankment. Both Riker and Walker were injured. Riker was removed from the driver’s seat. Hazelett found a knife near Riker’s foot, and Marble’s driver’s license outside the vehicle on the driver’s side. When Walker was pulled out of the passenger side, he was wearing a knife sheath on his belt. At trial, Bergman identified this sheath as the mate for the survival knife. Hazelett described Walker as half-white, half-Asian, with long black hair.
 

 Donald Dibble, formerly a LV Metro detective, testified that he impounded Riker’s and Walker’s clothes. The clothes associated with Walker included a pair of white Jordache athletic shoes, and a black vinyl knife sheath.
 

 Terry Cook (“Cook”), a criminalist for the LV Metro Crime Lab, tested items retrieved from the TSC van for Riker’s, Walker’s and Marble’s blood types. Cook testified that blood found on a set of black boots with red laces, on a pair of blue
 
 *861
 
 jeans, on a black-handled knife, and on a glove was consistent with Marble’s blood type, to the exclusion of Riker and Walker. Cook found a small amount of Type A blood on a pair of Jordache athletic shoes consistent with either Riker’s or Marble’s blood type. The amount of blood on a knife with a compass and a bent handle was not enough to test. Blood on other items corresponded with either Walker’s or Riker’s blood types.
 

 Richard Good (“Good”), an expert in footwear impression comparison, testified that several impressions in Marble’s blood trail corresponded to the Jordache athletic shoes in evidence, although not to the exclusion of all other athletic shoes. Two impressions corresponded to the Colorado boots.
 

 On June 21, 1994, the jury found Walker guilty of first-degree murder with use of a deadly weapon and robbery with use of a deadly weapon. Prior to the penalty phase, Walker filed a motion for a new trial based upon a claim of newly discovered evidence. The district court denied this motion. On December 8, 1994, Walker received two consecutive sentences of life without the possibility of parole plus two consecutive sentences of fifteen years for use of a deadly weapon. Walker filed notices of appeal from the judgment of conviction and from the denial of his motion for a new trial. This court consolidated the appeals.
 

 DISCUSSION
 

 First, Walker argues that the State failed to present sufficient evidence of guilt to support his convictions for murder with use of a deadly weapon and robbery with use of a deadly weapon; therefore, according to Walker, the district court erred in denying his motion for judgment of acquittal notwithstanding the jury verdict.
 

 When the sufficiency of evidence is challenged on appeal in a criminal case, this court inquires “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Hutchins v. State, 110 Nev. 103, 107-08, 867 P.2d 1136, 1139 (1994). “Circumstantial evidence alone may sustain a conviction.” McNair v. State, 108 Nev. 53, 56, 825 P.2d 571, 576 (1992).
 

 Evidence that Walker participated in the murder and robbery of Marble includes bloody footprints matching Walker’s athletic shoes and a knife at the murder scene that matched a sheath Walker was wearing when stopped in Barstow. Additionally, Walker’s fingerprint was found in the NOAA van a few blocks
 
 *862
 
 from the murder scene. Marble’s personal property and items with blood matching Marble’s blood type on them were found within the TSC van. We conclude that sufficient evidence in the record supports Walker’s convictions.
 

 Second, Walker argues that the district court erred in precluding him from presenting statements made by his co-defendant, Riker, at the guilt phase and at the penalty phase. In a letter to Walker dated November 4, 1992, Riker admitted to killing Marble and “the owner of the Suburban” (NOAA employee John Phippen (“Phippen”)) and made several statements exculpating Walker. On August 13, 1993, at a change of plea hearing, Riker pleaded guilty to first-degree murder and robbery with the use of a deadly weapon. During the hearing, Riker admitted under oath to stabbing Marble. On February 25, 1994, at Riker’s penalty hearing, he made an unsworn statement before a three-judge panel. The panel found that Riker murdered Marble, and imposed a sentence of death.
 

 On May 31, 1994, Walker filed a motion in limine requesting permission of the court to introduce the November 4, 1992 letter and to redact all references to Phippen’s killing from the letter. The trial court denied the motion. Later, during the guilt phase of trial, counsel for Walker asked the trial court to reconsider this decision, and sought to admit several additional documents. The trial court ruled that the findings and sentence of the three-judge panel, the change of plea transcript, the penalty hearing statement, and the letter were all inadmissible.
 

 The decision to admit or to exclude evidence is within the sound discretion of the trial court, and this court will not overturn the trial court’s determination absent manifest error. Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985). Evidence which is not relevant is not admissible. NRS 48.025(2).
 

 Walker argues that Riker’s change of plea statement and penalty hearing statement were admissible during the guilt phase under NRS 51.075, the general exception to the rule against hearsay, because they were made under special circumstances which offer assurances of accuracy. However, the record shows that Riker made other statements implicating Walker in both the Phippen and the Marble murders. Given the inconsistencies between Riker’s statements, we conclude that the district court properly decided that the change of plea and the penalty hearing statement were inadmissible.
 

 The trial court determined that Riker’s letter and penalty hearing statement were offered to exculpate Walker and thus required corroborating circumstances indicating that this evidence was
 
 *863
 
 trustworthy. Circumstances indicated that this evidence was untrustworthy; therefore, the trial court excluded this evidence from the guilt phase. Walker asserts that this ruling was in error because portions of these documents were admissible pursuant to the statement against interest exception to the rule against hearsay.
 

 A statement against penal interest is admissible if the declarant is unavailable at the time of the trial and if the statement was against the declarant’s penal interest at the time when made. NRS 51.345; Woods v. State, 101 Nev. 128, 132, 696 P.2d 464, 467 (1985).
 

 If the letter were redacted to exclude statements exculpating Walker, the remaining statements against interest would have little or no probative value, because Riker’s guilt does not preclude Walker’s criminal liability. Also, Riker’s remorseful penalty phase statement was not against his penal interest. Accordingly, we conclude that the trial court did not abuse its discretion in determining that portions of the letter and the penalty hearing statement were inadmissible.
 

 Walker asserts that parts of the letter were admissible pursuant to NRS 51.105, the state of mind exception to the hearsay rule, as statements of then-future intent. Walker has not shown the relevance of Riker’s then-future intent; hence, we conclude that the trial court properly refused to admit any parts of the letter.
 
 See
 
 Shults v. State, 96 Nev. 742, 751, 616 P.2d 388, 394 (1980).
 

 Walker contends that during the penalty phase, the trial court erred in determining that if the above evidence were admitted, the State would be allowed to admit all other statements made by Riker. Walker argues that statements other than those he sought to admit did not fall within any exceptions to the rule against hearsay, and that co-defendant statements were inadmissible pursuant to Bruton v. United States, 391 U.S. 123 (1968).
 

 “Questions of admissibility during the penalty phase of a capital murder trial are largely left to the discretion of the trial judge.” Lane v. State, 110 Nev. 1156, 1166, 881 P.2d 1358, 1365 (1994),
 
 cert. dismissed,
 
 514 U.S. 1058 (1995).
 
 But cf.
 
 Lord v. State, 107 Nev. 28, 43-44, 806 P.2d 548, 557 (1991) (admitting a non-testifying co-defendant’s confession during the penalty phase of a capital case generally violates the defendant’s constitutional right to confrontation).
 

 Admitting only some of Riker’s statements could have misled the jury. Also, as discussed above, the statements Walker sought
 
 *864
 
 to admit were of dubious veracity. Irrespective of the admissibility of other evidence, we conclude that the trial court did not err in precluding the statements made by Riker which Walker sought to admit.
 

 Finally, Walker argues that the preclusion of any evidence of Riker’s guilt precluded Walker from arguing that Riker was the sole actor in Marble’s death and that Walker was merely present at the scene. Given our conclusions above, we conclude that this argument is without merit.
 

 Third, Walker argues that the district court improperly denied his motion to disqualify Judge Guy, thereby denying his right to due process and a fair trial. Judge Guy was on the panel which sentenced Riker.
 

 “The burden is on the party asserting the challenge to establish sufficient factual grounds warranting disqualification.” In re Petition to Recall Dunleavy, 104 Nev. 784, 788, 769 P.2d 1271, 1274 (1988). Generally, “what a judge learns in his official capacity does not result in disqualification.” Kirksey v. State, 112 Nev. 980, 1007, 923 P.2d 1102, 1119 (1996). However,
 

 [A]n opinion formed by a judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, constitutes a basis for a bias or partiality motion where the opinion displays “a deep-seated favoritism or antagonism that would make fair judgment impossible.”
 

 Id., quoting
 
 Liteky v. United States, 510 U.S. 540, 555 (1994).
 

 In the instant case, Judge Guy noted that Walker sought to admit statements which were inconsistent with evidence admitted at Riker’s penalty hearing. This demonstrated a legitimate concern for the reliability of evidence brought before the jury.
 
 See generally
 
 Leonard v. State, 108 Nev. 79, 81, 824 P.2d 287, 289 (1992). We conclude that Walker failed to prove bias warranting Judge Guy’s disqualification.
 

 Fourth, Walker argues that the trial court violated his right to a fair trial by denying his pretrial motion in limine to introduce evidence that Riker killed William Rutkowski, Riker’s roommate, in 1990. Walker argues that by denying his motion, the district court prevented him from proving that Riker had the ability to act alone in the robbery and killing of Marble.
 

 Rutkowski’s and Marble’s homicides were dissimilar: Rutkowski was shot, and Marble was stabbed. Thus, assuming arguendo that Walker could prove the prior bad act by clear and
 
 *865
 
 convincing evidence,
 
 [1]
 
 it does not show that Riker acted alone in murdering Marble. Accordingly, evidence of Rutkowski’s homicide was properly deemed inadmissible. NRS 48.045(2).
 

 Fifth, Walker argues that the trial court erred in denying appellant’s motion to suppress evidence based on an illegal search and seizure of the TSC van.
 

 A police officer may stop a person when the officer has a reasonable suspicion of criminal activity. Terry v. Ohio, 392 U.S. 1, 22 (1969);
 
 see
 
 NRS 171.123. The officer must be able to point to specific and articulable facts which, when taken together with rational inferences from those facts, reasonably warrant intrusion.
 
 Terry,
 
 392 U.S. at 21.
 

 CHP Officer Flowers initiated a stop of the TSC van to investigate whether the driver was under the influence of alcohol. After reviewing the record, we conclude that Flowers had sufficient facts to form a reasonable suspicion that criminal activity was occurring, and thus the stop was lawful. Accordingly, we conclude that the trial court properly denied Walker’s motion to suppress.
 

 Sixth, Walker argues that the trial court improperly denied his challenges for cause against four prospective jurors. Walker contends that the district court improperly denied his challenges based upon the jurors’ indications that they could consider a sentence of life with the possibility of parole for a person convicted of first-degree murder in a dissimilar case. Walker relies upon People v. Livaditis, 831 P.2d 297 (Cal. 1992), wherein a prospective juror indicated a willingness to consider the death penalty under facts not applicable to the case, and the California Supreme Court held that the district court properly found that her ability to perform her duty was substantially impaired.
 

 A trial court has broad discretion in its rulings on challenges for cause. Wainwright v. Witt, 469 U.S. 412, 428-29 (1985). In
 
 Witt,
 
 the United States Supreme Court noted that the trial judge’s “predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. These are ‘factual issues’ . . . .”
 
 Id.
 
 at 429. The California Supreme Court has noted, “[o]n appeal, if the prospective juror’s responses are equivocal,
 
 i.e.,
 
 capable of multiple inferences, or conflicting, the trial court’s determination of that juror’s state of mind is binding.”
 
 Livaditis,
 
 831 P.2d at 303.
 

 
 *866
 
 This case involves the issue of whether prospective jurors were willing to impose a sentence of life
 
 with the possibility of parole,
 
 not whether or not a juror is willing to impose a sentence of death. However, our analysis remains guided by capital cases. “[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her view on capital punishment ... is whether the juror’s views would ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ ”
 
 Witt,
 
 469 U.S. at 424 (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). In Morgan v. Illinois, 504 U.S. 719 (1992), the United States Supreme Court held that a challenge for cause should be granted in a
 
 “reverse-Witherspoon”
 

 [2]
 

 situation, where a juror would always impose a sentence of death for one convicted of first-degree murder. The Court stated, “Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law.”
 
 Id.
 
 at 735.
 

 Walker challenged prospective jurors 154, 157, 162 and 164 for cause. The trial court denied these challenges, hence Walker utilized four of eight peremptory strikes to exclude these jurors. Walker indicated that he was unable to use peremptory strikes against four other prospective jurors who he believed should not have been on the jury panel, and who were ultimately members of the selected panel. This is sufficient to establish prejudice. Bryant v. State, 72 Nev. 330, 335, 305 P.2d 360, 362 (1956).
 

 Prospective jurors 154, 157, 162 and 164 had initially indicated that they could not vote to impose a sentence of life with the possibility of parole after convicting a person of first-degree murder. The prospective jurors were then given the following factual scenario: a man saw his child being raped by two men, and later found and killed the men. Each of the prospective jurors then indicated that they could consider life with the possibility of parole under these circumstances.
 

 Reviewing the cold record, we conclude that substantial evidence supports a determination that the views of jurors 154, 157,
 
 *867
 
 162, and 164 would not have prevented or substantially impaired the performance of their duties in accordance with their instructions and oath. Given the trial court’s broad discretion, we conclude that its denial of Walker’s challenges for cause of these jurors was proper.
 

 Walker further argues that the trial court used a double standard when it granted the State’s challenge for cause of a prospective juror who stated he could only impose the death penalty in “John Gacy-type” situations. Juror 104 expressed more than general objections to the death penalty; he indicated that he would be unwilling to impose a sentence of death in the case at bar. We conclude that the trial court did not abuse its discretion in granting the State’s challenge for cause of Juror 104.
 

 Seventh, Walker argues that the State exercised peremptory challenges against women with an intent to discriminate on the basis of gender.
 

 “[Pjotential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice.” J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 128, 114 S.Ct. 1419, 1421 (1994). “Gender, like race, is an unconstitutional proxy for juror competence and impartiality.”
 
 Id.
 

 In Batson v. Kentucky, 476 U.S. 79 (1986), the United States Supreme Court outlined a process for determining whether a prosecutor has used peremptory challenges in a discriminatory manner. First, the defendant must make a prima facie showing of intentional discrimination.
 
 Id.
 
 at 96. “In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances.”
 
 Id.
 
 at 96-97;
 
 accord
 
 Libby v. State, 113 Nev. 251, 255, 934 P.2d 220, 222 (1997). Second, the State must offer a gender-neutral explanation for striking the jurors.
 
 See
 
 Hernandez v. New York, 500 U.S. 352, 359 (1990). “At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation.”
 
 Id.
 
 at 360. Third, the trial court must decide whether the defendant has carried his burden of proving purposeful discrimination. Purkett v. Elem., 514 U.S. 765, 767 (1995). At this stage, the trial court may determine that the State’s justifications are mere pretexts for purposeful discrimination.
 
 Id.
 

 “The trial court’s decision on the ultimate question of discrim
 
 *868
 
 inatory intent represents a finding of fact of the sort accorded great deference on appeal.”
 
 Hernandez,
 
 500 U.S. at 364.
 

 Here, the State used five of eight peremptory challenges to strike women from the jury.
 
 Cf Libby,
 
 113 Nev. at 255, 934 P.2d at 223 (use of seven of nine peremptory challenges against female jurors established a prima facie case of discrimination). The record does not reveal a significant difference between prosecu-torial questioning of women and of men. For example, the State questioned both male and female prospective jurors regarding their feelings about Walker’s appearance. The record also shows that the State had non-pretextual, nondiscriminatory reasons to exercise peremptory challenges against each of the prospective jurors in question. We conclude that the trial court did not err in determining that the State exercised its peremptory challenges in a constitutionally permissible manner. Accordingly, we decline to address Walker’s other contentions elaborating upon this issue.
 

 Eighth, Walker argues that the trial court erred in admitting evidence of the theft in Blythe of the NOAA van and NOAA property. Walker asserts that this evidence does not fall within the “complete story of the crime” exception to the rule against evidence of other bad acts, because Marble’s murder could be explained without reference to the Blythe theft.
 

 NRS 48.035(3) states:
 

 Evidence of another act or crime which is so closely related to an act in controversy or a crime charged that an ordinary witness cannot describe the act in controversy or the crime charged without referring to the other act or crime shall not be excluded, but at the request of an interested party, a cautionary instruction shall be given explaining the reason for its admission.
 

 The State must prove that the defendant committed a prior bad act by clear and convincing evidence.
 
 Petrocelli,
 
 101 Nev. at 52, 692 P.2d at 503.
 

 Walker was in Blythe before Marble’s murder. The NOAA van stolen from Blythe was found a few blocks from Marble’s body. Bergmann testified that the sheath worn by Walker at his arrest matched a knife that had been in the NOAA van. This knife was found at the scene of Marble’s murder. Also, Walker’s fingerprint was found inside the NOAA van. Thus, there is clear and convincing evidence in the record that Walker was involved in the theft. Moreover, the Blythe theft served as a link in the sequence
 
 *869
 
 of events between the time that Walker left the carnival and the time that he was arrested in Barstow. Thus, evidence of the theft was closely related to the instant case. The trial court admitted evidence of the Blythe thefts, but would not admit evidence of Phippen’s murder. Thus, the record reflects that the trial court properly balanced the prejudicial effect of the Blythe evidence against its probative value. We conclude that the trial court did not manifestly abuse its discretion by admitting evidence of the Blythe theft.
 

 Ninth, Walker argues that several instructions given to the jury over his objections violated his right to due process and a fair trial.
 

 Walker argues that the jury instruction on mere presence
 
 [3]
 
 failed to instruct the jury that associating a defendant with the crime, rather than with a person who may have committed the crime, was essential. Walker contends that the instruction allowed the State’s closing argument to focus on Walker’s association with Riker, and allowed the jury to infer guilt based upon this association. Walker had submitted a proposed instruction on mere presence.
 

 It is not error not to give the defendant’s proposed instruction on “mere presence” when the actual instruction adequately covers the law. Doleman v. State, 107 Nev. 409, 416-17, 812 P.2d 1287, 1292 (1991). We have previously stated, “although mere presence cannot support an inference that one is a party to an offense, presence together with other circumstances may do so.” Palmer v. State, 112 Nev. 763, 769, 920 P.2d 112, 115 (1996) (quoting Baker v. State, 93 Nev. 11, 13, 558 P.2d 629, 629 (1977)).
 

 The instruction at issue here stated that mere presence “cannot support an inference that one is a party to an offense,” and that “presence, companionship and conduct before, during and after the crime are circumstances from which you may infer” participation in the offense. Following
 
 Palmer,
 
 we conclude that the instruction was proper.
 

 
 *870
 
 The trial court also instructed the jury that:
 

 All verdicts returned in this case must be unanimous. In considering the offense of Murder of the First Degree, however, you need not be unanimous in finding that the murder was premeditated and deliberate, or that it was perpetrated in the course and furtherance of a robbery or attempted perpetration of a robbery. It is sufficient that each of you finds, beyond a reasonable doubt, that the murder, under either theory, was Murder of the First Degree.
 

 Walker contends that this instruction violates his right to due process, because a jury’s theory of criminal liability must be unanimous.
 

 In Schad v. Arizona, 501 U.S. 624, 640-43 (1991), the United States Supreme Court held that the trial court did not err in failing to require a jury to agree on a single theory of first-degree murder. At issue was the
 
 mens rea
 
 required for felony murder as compared to the
 
 mens rea
 
 required for premeditated murder.
 
 Id.
 
 The Court noted that both theories carried the same risk of punishment.
 
 Id.
 
 at 644 n.9.
 

 In Nevada, aiding and abetting in an act that constitutes an offense carries the same risk of punishment as directly committing the act.
 
 See
 
 NRS 195.020. Also, felony murder and deliberate and premeditated killing are both first-degree murder and are punishable by death.
 
 See
 
 NRS 200.030. Following
 
 Schad,
 
 we conclude that the trial court did not err in instructing the jury that it did not have to unanimously agree upon a theory of murder.
 

 Walker argues that the jury instruction on flight
 
 [4]
 
 violated his right to due process because it created a mandatory presumption of guilt, and that the facts of this case did not warrant such an instruction, because he was unconscious in the passenger seat while Riker drove the van.
 

 In Miles v. State, 97 Nev. 82, 85, 624 P.2d 494, 496 (1981), this court stated:
 

 [A] flight instruction may give undue influence to one phase of evidence, therefore we will carefully scrutinize it to be
 
 *871
 
 certain that the record supports the conclusion that appellant’s going away was not just a mere leaving but was with a consciousness of guilt and for the purpose of avoiding arrest.
 

 In this case, the instruction stated in part, “The flight of a person after the commission of a crime is not sufficient in itself to establish guilt.” This does not create a mandatory presumption. Additionally, evidence supports the conclusion that Walker traveled with a consciousness of guilt and for the purpose of avoiding arrest. We conclude that the flight instruction was proper.
 

 Lastly, Walker argues that the “reasonable doubt” instruction suggested that a higher degree of doubt was required than is required for acquittal under the reasonable doubt standard.
 
 See
 
 Cage v. Louisiana, 498 U.S. 39 (1990) (invalidating a jury instruction on reasonable doubt which included the words “substantial” and “grave”). The instruction is a verbatim recital of NRS 175.211(1). We have previously held that the current statutory definition is constitutional. Milton v. State, 111 Nev. 1487, 1492, 908 P.2d 684, 687 (1995);
 
 Hutchins,
 
 110 Nev. at 112, 867 P.2d at 1142. In sum, we conclude that each of the challenged jury instructions was proper.
 

 Tenth, Walker argues that the trial court abused its discretion by refusing to allow Dr. Pitterman, an internal medicine doctor, to testify about Walker’s history of drug abuse and alcoholism and level of intoxication at the time of the crime. The trial court had ruled that this evidence did not fall within the medical diagnosis exception to the hearsay rule. Walker contends that Dr. Pitterman’s determination of Walker’s blood alcohol level during the evening of April 13, 1992, was reliable because it was based upon hospital records, and therefore was admissible pursuant to the general exception to the rule against hearsay.
 
 See
 
 NRS 51.075; Emmons v. State, 107 Nev. 53, 807 P.2d 718 (1991) (testimony of a medical examiner regarding another radiologist’s opinion was properly admitted where the medical examiner was a disinterested witness with no apparent motive to lie). Walker asserts that the evidence was critical because it helped prove that he lacked the
 
 mens rea
 
 to commit first-degree murder.
 

 On May 27, 1994, Dr. Pitterman interviewed Walker concerning his medical history. He then sent his findings to defense counsel. Dr. Pitterman’s statements appear to have been generated for the purposes of litigation, not for medical diagnosis or treatment. Therefore, his testimony was not admissible under the medical diagnosis exception to the hearsay rule, NRS 51.115.
 

 
 *872
 
 Dr. Pitterman was not a disinterested witness, but made his report at the request of defense counsel. Moreover, Dr. Pitterman’s conclusions were partly based upon information obtained from Walker. For example, Walker told Dr. Pitterman that he had been smoking marijuana on April 13, 1992, and the doctor stated that the use of marijuana would increase the effect of alcohol. We conclude that the trial court did not abuse its discretion in refusing to admit Dr. Pitterman’s testimony.
 

 Eleventh, Walker argues that the State made numerous improper remarks in the presence of the jury that constituted prejudicial prosecutorial misconduct.
 

 “If the issue of guilt or innocence is close, if the state’s case is not strong, prosecutor misconduct will probably be considered prejudicial.” Garner v. State, 78 Nev. 366, 373, 374 P.2d 525, 530 (1962). Where evidence of guilt is overwhelming, even aggravated prosecutorial misconduct may be harmless error. Riley v. State, 107 Nev. 205, 213, 808 P.2d 551, 556 (1991). After reviewing the record, we conclude that the effect of any prosecutorial misconduct in this case was harmless.
 

 Twelfth, Walker argues that the district court erred in denying him the opportunity to present mitigating evidence at the penalty hearing. Walker contends that a delay in financing travel and lodging costs prevented three key penalty phase witnesses from testifying.
 

 On June 21, 1994, the trial court scheduled the penalty phase to begin on October 10, 1994. On October 4, 1994, defense counsel submitted an order to the court for the payment of transportation and lodging costs of penalty hearing witnesses. This request was erroneously denied. On October 7, 1994, an order for payment of these fees was filed.
 

 Walker had several months in which to prepare an order for the costs of witness transportation and lodging. He has failed to explain how a three-day delay in the filing of his order prejudiced him. We conclude that this contention lacks merit.
 

 Thirteenth, Walker argues that the district court erred in denying his motion for a new trial based upon newly discovered evidence, consisting of a statement made by Riker after Walker’s convictions. Walker contends that a defense witness, Jody Diaz (“Diaz”), changed her testimony after meeting with a prosecutor, and as a result Walker could not call her to testify. Walker appears to argue that if Riker’s statement was available to impeach Diaz, Diaz could be called to testify that Walker purchased pure-grain alcohol from her on the day of the murder.
 

 
 *873
 
 The grant or denial of a new trial on the ground of newly discovered evidence is within the discretion of the trial court. Sanborn v. State, 107 Nev. 399, 406, 812 P.2d 1279, 1284 (1991).
 

 To establish a basis for a new trial on this ground, the evidence must be: newly discovered; material to the defense; such that even with the exercise of reasonable diligence it could not have been discovered and produced for trial; noncumulative; such as to render a different result probable upon retrial; not only an attempt to contradict, impeach, or discredit a former witness, unless the witness is so important that a different result would be reasonably probable; and the best evidence the case admits.
 

 Id.,
 
 812 P.2d at 1284-85;
 
 see
 
 NRS 176.515.
 

 In the trial court’s order denying Walker’s motion for a new trial, it found that the defense made a tactical decision not to call Diaz as a witness.
 

 Diaz’ testimony would support Walker’s argument that he was too drunk to commit first-degree murder. However, we conclude that it is not reasonably probable that the new evidence would lead to a different result; therefore, the trial court properly denied Walker’s motion for a new trial.
 

 We affirm the judgment of conviction and the denial of Walker’s motion for a new trial.
 

 [1]
 

 The district court noted that no one had been charged with Rutkowski’s homicide.
 
 See Petrocelli,
 
 101 Nev. at 51, 692 P.2d at 508 (prior bad act must be proved by clear and convincing evidence).
 

 [2]
 

 Walker’s opening brief contains an extensive discussion of Witherspoon v. Illinois, 391 U.S. 510 (1968). In
 
 Witherspoon,
 
 the United States Supreme Court held that excluding prospective jurors because they voiced general objections to the death penalty did not produce an impartial jury, but instead a jury “uncommonly willing to condemn a man to die.”
 
 Id.
 
 at 521. Subsequently, the Supreme Court clarified that the holding in
 
 Witherspoon
 
 concerns circumstances under which prospective jurors
 
 cannot
 
 be excluded, but does not delineate when prospective jurors
 
 can
 
 be excluded. Wainwright v. Witt, 469 U.S. 412, 422 (1984); Adams v. Texas, 448 U.S. 38, 48 (1979)
 
 (Witherspoon
 
 is not a ground for challenging a prospective juror). Accordingly, in the instant case,
 
 Witherspoon
 
 is not on point.
 

 [3]
 

 The instruction stated:
 

 Mere presence at the scene of a crime cannot support an inference that one is a party to an offense. However, the defendant’s presence, companionship and conduct before, during and after the crime are circumstances from which you may infer his participation in the criminal act.
 

 The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping commit the crime.
 

 [4]
 

 The instruction stated:
 

 The flight of a person after the commission of a crime is not sufficient in itself to establish guilt; however, if flight is proved, it is circumstantial evidence in determining guilt or innocence.
 

 The essence of flight embodies the idea of deliberately going away with consciousness of guilt and for the purpose of avoiding apprehension or prosecution. The weight to which such circumstance is entitled is a matter for the jury to determine.