STEVEN KACZMAREK, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 41556

June 7, 2004                                    91 P.3d 16

*Paul E. Wommer,* Las Vegas, for Appellant.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Respondent.

318

# OPINION

*Per Curiam:*

Appellant Steven Kaczmarek was charged, tried before a jury, and found guilty of burglary, robbery, first-degree kidnapping, and first-degree murder, all committed with the assistance of a child. At the conclusion of the penalty phase, the jury returned a verdict of death for the murder.

Kaczmarek appeals, arguing first that police detectives violated his rights under the Fifth and Sixth Amendments of the United States Constitution by interviewing him regarding the instant crimes while he was incarcerated for unrelated charges and, second, that the district court erred during jury selection by denying his objections to the State's peremptory challenges of four non-Caucasian prospective jurors. We conclude that Kaczmarek is not entitled to relief on these claims. Related to his death sentence, Kaczmarek argues that the district court erred during the penalty phase by excluding the testimony of the victim's daughter regarding her opposition to the death penalty in this case. We disagree. Accordingly, we affirm Kaczmarek's judgment of conviction and sentence of death.

## FACTS

The State's evidence during the guilt phase of trial showed that the victim, Pedro Villareal, lived alone in an apartment unit in Las Vegas. He was last seen at his apartment complex on the morning of September 25, 2002. On September 26 and 27, the complex suffered from a worsening shortage of hot water. On September 27, employees of the complex began checking the apartment units for leaks. When they entered Villareal's unit, they discovered his dead body in the bathtub and summoned police.

Villareal's body was found tilted facedown into the bathtub, with the hands and wrists bound from behind by an extension cord, the legs bound with a cut electrical cord, and a pillowcase over the head. It was clad only with pants that had one pocket turned inside out. Water was up to the sides of the body and was still pouring from the showerhead over the body and out of the tub. The apartment unit was in general disarray. No money or wallet could be found, but police recovered various items of evidentiary value, including cigarette butts. Villareal's daughter reported that her father's VCR and gold bracelet were missing from the apartment.

A pathologist autopsied Villareal's body on September 28, 2002, and found that the body bore a number of injuries but no defensive wounds. The pillowcase that covered the head was still wet. A

blood-soaked, ankle-length, cotton athletic sock was recovered from the mouth. Villareal had likely been dead for at least thirty-six hours prior to autopsy, and the cause of death was asphyxia from a homicide that involved suffocation, strangulation, and drowning.

Police had no leads in the murder until October 21, 2002. On that date, an inmate at the Clark County Detention Center (CCDC), where thirty-two-year-old Kaczmarek was also incarcerated for charges unrelated to the crimes against Villareal, contacted Las Vegas Metropolitan Police Department (LVMPD) detectives. The inmate relayed to detectives Kaczmarek's admissions to a killing that matched the known facts surrounding Villareal's death. Based on this new lead, detectives ran Kaczmarek's name through LVMPD's pawn detail and determined that he had pawned a VCR and gold bracelet at a local pawnshop. On October 23, 2002, police recovered from the pawnshop Villareal's VCR and bracelet and a receipt bearing the signature "Steven Kaczmarek" and indicating that the items were pawned during the late evening of September 25, 2002. An employee of the pawnshop, who testified at trial, identified Kaczmarek as having pawned the items. A document examiner compared Kaczmarek's known handwriting and the signature on the pawnshop ticket and found it highly probable that Kaczmarek had signed the ticket.

Meanwhile, a second inmate with whom Kaczmarek was incarcerated at CCDC also contacted LVMPD and told detectives that Kaczmarek admitted to killing a man. The description of this killing, as relayed by the second inmate, also proved consistent with the known facts surrounding the Villareal homicide.

On October 29, 2002, detectives approached Kaczmarek while he remained in custody on the unrelated charges, and he agreed to give a recorded statement. Kaczmarek told detectives that he and his girlfriend, Alisha, a fifteen-year-old foster child from Ohio, had been living on the streets with Alisha begging for money to support them. The two of them, along with a man named "Tommy," met Villareal, who invited them to his home to watch videotapes, drink beer, and stay overnight. Kaczmarek thought that he and his accomplices would "beat up" Villareal and take his money. At Villareal's apartment, Kaczmarek saw that Villareal had thirty dollars and then attacked Villareal by choking him and causing him to lose consciousness. Kaczmarek, Alisha, and Tommy took turns choking Villareal. Kaczmarek then stood on Villareal's back and used an electrical cord to bind his feet. Kaczmarek told Alisha to cut a cord from a fan, and they used this cord to bind Villareal's hands. Kaczmarek and Tommy then put Villareal facedown in the bathtub. Kaczmarek, concerned that he had left DNA evidence by dripping sweat, cut off and removed

Villareal's shirt. Next, Kaczmarek put a sock in Villareal's mouth and a pillowcase over his head, turned the showerhead on, and shut the bathroom door. Kaczmarek admitted to taking from the apartment Villareal's VCR, gold bracelet, wallet, twenty dollars in cash, a ten-dollar roll of quarters, and miscellaneous items of personal property. At the pawnshop, Kaczmarek received forty dollars for the bracelet and VCR.

Subsequent scientific analysis of a cigarette butt recovered from Villareal's apartment was consistent with Kaczmarek having left his DNA on the butt.

Kaczmarek testified as the only defense witness during the guilt phase. He again admitted to planning a robbery, conspiring with Alisha to rob Villareal before entering his apartment, choking Villareal and causing him to pass out, tying him up with electrical cords, putting the sock in his mouth and the pillowcase over his head, leaving him facedown in the tub with the showerhead on, and taking and pawning his personal property. He departed from his earlier statements, however, by claiming that ''Tommy'' was a fictional character created by detectives and by placing more of the blame on Alisha for initiating and directing the physical attack on Villareal. Kaczmarek testified that he ''pretty much just did whatever [Alisha] wanted to do'' but he never intended to kill Villareal.

On cross-examination, Kaczmarek admitted that he had Illinois convictions for 1988 crimes, including two felony counts of aggravated criminal sexual assault, one felony count of home invasion, and one felony count of armed robbery. He also admitted to an Ohio conviction for a 1996 felony aggravated burglary.

During the penalty phase, the State presented victim impact evidence from Villareal's fifteen-year-old daughter, Amanda, who testified regarding Villareal's personal characteristics and the impact the loss of his life had on her.

The State also presented evidence on Kaczmarek's prior convictions and parole status. First, the victim of the crimes leading to Kaczmarek's Illinois convictions testified that Kaczmarek entered her home uninvited, threatened to kill her while armed with a knife, sexually assaulted her orally and vaginally while still armed with the knife, and led her about her home to get her personal belongings. Ultimately, Kaczmarek stuck a ''bunch'' of toilet paper inside her mouth so she could not talk, tied a pillowcase around her mouth and head as a gag, and took her to the basement where he used an electrical extension cord to bind her hands, feet, and head and to tie her to a pipe. After Kaczmarek ripped out the victim's telephone line and left in her car, she freed herself and summoned police assistance. A police officer testified that Kaczmarek was arrested after a foot chase and admitted to entering the victim's house with intent to rob her, robbing her, and sexually as-

saulting her. Kaczmarek later pleaded guilty to two counts of aggravated sexual assault, one count of home invasion, and one count of armed robbery. In February 1989, he was sentenced to concurrent prison terms of fifteen years on each count. Certified copies of related court documents and the judgment of conviction were admitted into evidence.

Second, the victim in the case leading to Kaczmarek's Ohio conviction testified regarding the burglary of his home, which involved property destruction as well as the taking of personal property, including a safe that contained a large amount of money. An Ohio detective testified that Kaczmarek was out on parole for his Illinois convictions when arrested for the Ohio burglary. Kaczmarek ultimately pleaded guilty to aggravated burglary. In December 1996, he was sentenced to five to fifteen years in the Ohio penitentiary. A certified copy of the judgment of conviction and Kaczmarek's written confession were admitted into evidence.

Third, an Ohio parole officer testified that Kaczmarek was released on parole from his Ohio sentence in September 2000, but was sent back to Illinois for parole revocation proceedings. He served approximately fifteen months in Illinois and was released in December 2001. He remained on Ohio parole, but did not report back to Ohio as required until July 2002, after parole authorities learned that he had been taken into custody in May 2002 for committing a theft at a Kmart. Kaczmarek was allowed to continue on parole with special conditions, including having no contact with other felons or children under the age of eighteen years and having no use of or control over alcohol. In August 2002, Kaczmarek's parole officer visited the home of another parolee and found Kaczmarek present with the underage Alisha and in violation of the alcohol condition of his parole. Kaczmarek failed to attend his next scheduled meeting with his parole officer and failed to report for a sex offender assessment. On September 17, 2002, Kaczmarek's family informed the authorities that Kaczmarek had not been seen for weeks and that Alisha and a car were missing from the home of Alisha's foster parents. Parole authorities declared Kaczmarek a violator at large.

During the defense case, Kaczmarek's counsel read to the jury Kaczmarek's mother's written statement wherein she begged for her son's life to be spared and expressed her sorrow, her love for him, and her belief that he intended to rob, but not kill, Villareal.

Kaczmarek made an unsworn statement to the jury. He expressed remorse and apologized for what he had done and the pain he caused. He stated that he did not mean to kill Villareal and was not the type of person who would kill. He also spoke of his own emotional suffering while incarcerated, his history of taking responsibility for his actions, and his youth in Chicago, where he ap-

parently fell in with the wrong people. He described himself as a follower, but also a good and caring person. He claimed that his current circumstances resulted from being "too caring" and making the wrong decisions. He told the jury that he had a new son, whom he had never seen, and that he wanted to be a father to his son. He explained that he grew up with stepfathers who physically abused his mother and him. Finally, he begged the jurors to spare his life and asked for forgiveness.

The jury returned a special verdict finding that the State proved beyond a reasonable doubt three of four alleged aggravating circumstances: (1) the murder was committed by a person under a sentence of imprisonment, (2) the murder was committed by a person who has previously been convicted of a felony involving the use or threat of violence, and (3) the murder was committed during the commission of a robbery and/or for monetary gain. The jury also returned a special verdict finding as the only mitigating circumstance "the possibility of a less than ideal upbringing and/or family life." Finally, the jury found that the aggravating circumstances outweighed the mitigating circumstance and imposed a sentence of death.

On June 3, 2003, the district court entered its judgment of conviction sentencing Kaczmarek as follows: for burglary with the assistance of a child, two consecutive terms of imprisonment for a minimum of 36 months and a maximum of 120 months; for robbery with the assistance of a child, two consecutive terms of imprisonment for a minimum of 36 months and a maximum of 156 months; for first-degree kidnapping with the assistance of a child, two consecutive terms of imprisonment for life with the possibility of parole after five years; and for first-degree murder with the assistance of a child, the penalty of death.

## DISCUSSION

*Alleged violations of the Fifth and Sixth Amendment rights to counsel*

Relying solely on the transcript of his preliminary hearing, Kaczmarek argues that his Fifth and Sixth Amendment rights were violated when detectives interviewed him at CCDC. We conclude that Kaczmarek is not entitled to relief on these claims.

At the preliminary hearing, Detective Robert Wilson testified that when he and his partner first met with Kaczmarek at CCDC, Wilson's partner advised Kaczmarek of his rights under *Miranda v. Arizona*.[2] Wilson testified that Kaczmarek responded, saying

> that he wanted to talk to us. He said his attorney was coming this afternoon and wondered if we can talk to him then. We

[2]384 U.S. 436 (1966).

told him we are here now, and we want to talk to you, and we are busy in the afternoon, and if you want to talk to us, you can talk to us now.

Kaczmarek then said he would talk to detectives, and detectives readmonished him of his *Miranda* rights by reading those aloud. Kaczmarek signed a written admonishment card and gave the recorded statement implicating himself in the crimes against Villareal.

At the conclusion of the preliminary hearing, Kaczmarek's counsel orally moved to suppress his statement. Counsel alleged a violation of Kaczmarek's Sixth Amendment right to counsel stemming from the facts that, at the time of the CCDC interview, Kaczmarek was in custody and represented by counsel for formal criminal charges in an unrelated case. The State responded to Kaczmarek's motion by noting that the issue involved both the Fifth and Sixth Amendment rights to counsel and then arguing that neither right had been violated. The justice court denied Kaczmarek's motion.

Kaczmarek next filed in the district court a written pretrial motion to suppress his statement to detectives. Though Kaczmarek nominally cited to the Fifth Amendment, his argument was aimed at showing a violation of the Sixth Amendment right to counsel. Kaczmarek argued that his right to counsel must have been violated by the police interview at CCDC because he clearly requested counsel and, at the time of the interview, he had appointed counsel and stood formally charged and was in custody on another criminal case. The district court heard argument, found that Kaczmarek's right to counsel in this case had not attached at the time of the interview, and entered a written order summarily denying his motion.

At trial, Detective Wilson provided additional testimony regarding the interview at CCDC. He stated that he and his partner first took Kaczmarek to a private room but did not make him promises, threaten him, or coerce him. Once Kaczmarek agreed to talk to them, they did not coax him or encourage him regarding what to say during the recorded interview. They began recording the interview, and Detective Wilson's partner read aloud to Kaczmarek the *Miranda* rights admonishment card, which stated:

> 1. You have the right to remain silent. 2. Anything you say can be used against you in a court of law. 3. You have the right to the presence of an attorney. 4. If you cannot afford an attorney, one will be appointed before questioning. 5. Do you understand these rights?

Kaczmarek verbally indicated that he understood his rights, and he read and signed the admonishment card. Kaczmarek then confessed.

Kaczmarek did not renew his motion to suppress based on Detective Wilson's trial testimony. The audiotapes of the recorded interview were admitted into evidence at trial and reflect that the interview lasted for one hour and ten minutes, during which Kaczmarek spoke freely about the crimes without referring to counsel or indicating any desire to stop the interview.

On appeal, Kaczmarek again bases his arguments almost entirely on the Sixth Amendment. This amendment provides that ''[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.''[3] The Sixth Amendment right to counsel, which applies to the states by way of the Fourteenth Amendment's Due Process Clause,[4] prevents admission at trial of a defendant's statements which police have deliberately elicited after the right has attached and without obtaining a waiver or providing counsel.[5] Once a defendant invokes the Sixth Amendment right to counsel, the government must cease further attempts to obtain his statements until he has been provided counsel, unless he initiates the conversation and waives his rights.[6]

However, the Sixth Amendment right to counsel does not even attach in a case until adversarial proceedings have commenced in *that* case '' ' ''whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'' ' ''[7] The right ''cannot be invoked once for all future prosecutions.''[8]

> ''The police have an interest . . . in investigating new or additional crimes [after an individual is formally charged with one crime.] . . . [T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. . . .''

[3]U.S. Const. amend. VI.

[4]*See Simmons v. State,* 112 Nev. 91, 98, 912 P.2d 217, 221 (1996).

[5]*Fellers v. United States,* 540 U.S. 519, 523 (2004); *Patterson v. Illinois,* 487 U.S. 285 (1988); *Massiah v. United States,* 377 U.S. 201, 206-07 (1964).

[6]*Patterson,* 487 U.S. at 291; *McNeil v. Wisconsin,* 501 U.S. 171, 175 (1991); *Michigan v. Jackson,* 475 U.S. 625, 635-36 (1986).

[7]*Fellers,* 540 U.S. at 523 (quoting *Brewer v. Williams,* 430 U.S. 387, 398 (1977) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689 (1972))); *Davis v. United States,* 512 U.S. 452, 456-57 (1994); *Estelle v. Smith,* 451 U.S. 454, 469-70 (1981); *Coleman v. State,* 109 Nev. 1, 4, 846 P.2d 276, 278 (1993).

[8]*McNeil,* 501 U.S. at 175.

''Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses.''[9]

Thus, the offense-specific Sixth Amendment right does not require suppression of statements deliberately elicited during a criminal investigation merely because the right has attached and been invoked in an unrelated case.[10]

We conclude that the district court correctly determined that Kaczmarek's Sixth Amendment right to counsel did not prevent detectives from initiating the interview at CCDC. It is undisputed that Kaczmarek had a Sixth Amendment right to counsel which he had invoked in the unrelated case. But he does not contend that formal prosecution had commenced for his crimes against Villareal. Accordingly, when detectives interviewed Kaczmarek, the Sixth Amendment right had not yet attached in this case and did not prohibit the State from using Kaczmarek's statement at trial.

Kaczmarek nevertheless asserts that under *Escobedo v. Illinois*,[11] attachment (and, apparently, invocation) of the Sixth Amendment right must be presumed to prohibit officers from initiating an interview of a defendant in custody if they are investigating any crime of which that defendant is suspected. In *Escobedo*, the United States Supreme Court held that the defendant's Sixth Amendment right to counsel was violated when he was subjected to custodial interrogation, requested and was refused counsel, and was not effectively warned of his right to remain silent.[12] However, the Court later limited *Escobedo* to its own facts after determining, in retrospect, that *Escobedo* was not a Sixth Amendment right to counsel case but, instead, was intended to effectuate the Fifth Amendment privilege against self-incrimination.[13] Kaczmarek's case presents no facts similar to those that concerned the Court in *Escobedo*.

Next, we consider Kaczmarek's conclusory claim that his Fifth Amendment rights were violated by the State's use of his confession at trial. Kaczmarek fails to set forth argument to specifically support this claim. But within the context of his Sixth

---

[9]*Id.* at 175-76 (quoting *Maine v. Moulton,* 474 U.S. 159, 179-80 & n.16 (1985)) (alteration in original).

[10]*See id.* at 175 (citing *United States v. Gouveia,* 467 U.S. 180, 188 (1984)); *Clabourne v. Lewis,* 64 F.3d 1373, 1378 (9th Cir. 1995).

[11]378 U.S. 478 (1964).

[12]*Id.* at 490-91.

[13]*See Kirby,* 406 U.S. at 689 (plurality opinion); *Johnson v. New Jersey,* 384 U.S. 719, 729, 733-34 (1966); *see also Barone v. State,* 109 Nev. 1168, 1170, 866 P.2d 291, 292 (1993).

Amendment right to counsel claim, he argues that the preliminary hearing testimony of Detective Wilson shows that Kaczmarek clearly requested counsel.[14] To the extent that Kaczmarek raised this argument below, the court rejected it, and that determination will not be disturbed on appeal if supported by substantial evidence.[15] Additionally, Kaczmarek failed to adequately preserve below and fails to adequately assert on appeal the issue of whether his Fifth Amendment or *Miranda* right to counsel has been violated. However, because the question is an important one and the State has briefed the issue, plain error review is warranted. Thus, we consider whether there was ''error,'' that was ''plain,'' and that affected the defendant's substantial rights.[16] On the record here, we conclude that substantial evidence supports a determination that Kaczmarek did not invoke his *Miranda* right to counsel when detectives approached him. Therefore, the district court did not err in admitting Kaczmarek's statement into evidence at trial.

The Fifth Amendment of the Federal Constitution states, ''No person . . . shall be compelled in any criminal case to be a witness against himself.''[17] The Fourteenth Amendment makes this privilege against self-incrimination binding upon the States.[18] In *Miranda,* the United States Supreme Court established a prophylactic right to have counsel present during custodial interrogations.[19] In *Edwards v. Arizona,*[20] the Court established a rule for this *Miranda* right to counsel.[21] Pursuant to *Edwards,* once a sus-

---

[14]Kaczmarek ignores Detective Wilson's direct-examination testimony, quoted *supra,* and relies on the following defense cross-examination:

> Q. As a matter of fact, when you first met with him, he said he wanted to wait until his counsel got there, but you said, well, we are here now. We are busy this afternoon. Do you want to talk to us now or not?
>
> A. In essence, yes.

To whatever extent this summation by defense counsel recasts the detective's direct-examination testimony, the district court was free to reject it in favor of the direct testimony.

[15]*Tomarchio v. State,* 99 Nev. 572, 575, 665 P.2d 804, 806 (1983).

[16]*Green v. State,* 119 Nev. 542, 545, 80 P.3d 93, 95 (2003); *Leonard v. State,* 117 Nev. 53, 63, 17 P.3d 397, 403-04 (2001); NRS 178.602 (''Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.'').

[17]U.S. Const. amend. V.

[18]*Malloy v. Hogan,* 378 U.S. 1 (1964).

[19]*McNeil,* 501 U.S. at 176.

[20]451 U.S. 477 (1981).

[21]*McNeil,* 501 U.S. at 176-77.

pect has "expressed his desire to deal with the police only through counsel," not only must the current interrogation cease, but he may not be approached for further interrogation "until counsel has been made available to him."[22] If police later initiate an encounter in the absence of counsel and there has been no break in custody, "the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards."[23] The *Edwards* rule is not offense specific and bars police-initiated interrogations related to *any* offense once a suspect has invoked the *Miranda* right to counsel regarding one offense.[24] However, suppression under *Edwards* "requires a court to 'determine whether the accused actually invoked his right to counsel.' "[25]

Kaczmarek does not claim that he specifically invoked his *Miranda* right to have counsel present during any questioning related to his other case. Therefore, any Fifth Amendment claim must depend on whether he invoked the *Miranda* right to counsel when approached by detectives at CCDC.

In *Davis v. United States,*[26] the United States Supreme Court explained that to invoke the *Miranda* right to counsel and trigger the *Edwards* exclusionary rule, "the suspect must unambiguously request counsel."[27] The Court held that when a suspect refers to counsel ambiguously or equivocally, such that a reasonable police officer in the circumstances would understand "only that the suspect *might* be invoking the right to counsel," police are not required to ask clarifying questions and may continue with questioning.[28] Applying this rule in *Davis,* the Court upheld lower court rulings that the defendant's statement—"Maybe I should talk to a lawyer"—made during an interview that followed his receipt of a rights admonishment, did not constitute an assertion of the *Miranda* right to counsel and cessation of questioning was not required.[29]

In *Harte v. State,*[30] we adopted the analysis in *Davis.* We apply this analysis here to determine whether Kaczmarek's rights were

[22]*Edwards,* 451 U.S. at 484-85; *McNeil,* 501 U.S. at 176-77.

[23]*McNeil,* 501 U.S. at 177.

[24]*Id.* at 177; *Arizona v. Roberson,* 486 U.S. 675, 680-88 (1988); *Boehm v. State,* 113 Nev. 910, 914, 944 P.2d 269, 272 (1997).

[25]*Clark v. Murphy,* 331 F.3d 1062, 1069 (9th Cir.) (quoting *Smith v. Illinois,* 469 U.S. 91, 95 (1984)), *cert. denied,* 540 U.S. 968 (2003).

[26]512 U.S. 452.

[27]*Id.* at 459.

[28]*Id.* at 459, 461-62.

[29]*Id.* at 462.

[30]116 Nev. 1054, 1065-67, 13 P.3d 420, 427-29 (2000).

violated by detectives' questioning following his initial statement referring to counsel, as paraphrased by Detective Wilson at the preliminary hearing: "He said that he wanted to talk to us. He said his attorney was coming this afternoon and wondered if we can talk to him then."

We have compared Kaczmarek's reference to counsel to the reference to counsel in *Davis* and such references in other cases which we and other courts have determined to be ambiguous or equivocal[31] or, conversely, clear requests for counsel.[32] From this comparison, we have no difficulty in concluding that Kaczmarek's reference did not constitute an invocation of his *Miranda* right to counsel. *Davis* set forth a bright-line standard under which a statement referring to counsel " 'either is . . . an assertion of the right to counsel or it is not.' "[33] "The word 'attorney' has no talismanic qualities. A defendant does not invoke his right to counsel any time the word falls from his lips."[34] The record here shows that Kaczmarek was thirty-two years old and experienced in the criminal justice system. Further, he received verbal *Miranda* warnings prior to his reference to counsel. This reference was so ambiguous that reasonable officers in the cir-

---

[31]*See, e.g., Davis,* 512 U.S. at 462; *Harte,* 116 Nev. at 1067-68, 13 P.3d at 429 (upholding trial court's ruling that defendant failed to invoke right to counsel when he stated after receipt of *Miranda* warnings, "Just out of curiosity, when do I get to talk to a lawyer? . . . [T]hey told me, you know, that they thought I should talk to a lawyer or whatever," and, after being reminded of his rights and continuing with the interview, stated, "I don't wanna be a bitch and say, you know, give my [sic] lawyer. But I mean. . . . What do you think a lawyer would tell me right now?"); *Clark,* 331 F.3d at 1064-65, 1070-72 (concluding on habeas review that state court did not unreasonably apply clearly established federal law in determining defendant's statement—"I think I would like to talk to a lawyer"—which was given after receipt and acknowledgement of *Miranda* rights warning, was ambiguous); *Ledbetter v. Edwards,* 35 F.3d 1062, 1069-70 (6th Cir. 1994) (concluding that defendant's statement—"It would be nice [to have an attorney]"—made after receipt of multiple *Miranda* warnings, was too ambiguous to invoke right to counsel). *See generally Soffar v. Cockrell,* 300 F.3d 588, 595 (5th Cir. 2002) (and cases cited therein).

[32]*See, e.g., Smith,* 469 U.S. at 92-93 (determining that defendant unambiguously requested counsel where he stated after *Miranda* warnings, "Uh, yeah. I'd like to do that [consult with a lawyer and have a lawyer present]."); *Allan v. State,* 118 Nev. 19, 24, 38 P.3d 175, 178 (2002) (stating that defendant made an unequivocal request for counsel when he stated during rights advisement, "I don't want to say a word anyway, I want to see my lawyer."); *U.S. v. Cheely,* 36 F.3d 1439, 1448 (9th Cir. 1994) (concluding that unequivocal request for counsel was made where defendant refused to sign waiver and stated, "[M]y attorney does not want me to talk to you.").

[33]*Davis,* 512 U.S. at 459 (quoting *Smith,* 469 U.S. at 97-98); *Soffar,* 300 F.3d at 595.

[34]*United States v. Jardina,* 747 F.2d 945, 949 (5th Cir. 1984).

cumstances of Detective Wilson and his partner would have only understood that Kaczmarek "*might* be invoking the right to counsel."[35] Thus, substantial evidence demonstrates that Kaczmarek did not invoke the *Miranda* right to counsel by his reference to counsel.

We further conclude that the evidence sufficiently demonstrates that Kaczmarek knowingly and intelligently waived his *Miranda* rights.[36] Prior to giving the statement regarding his crimes against Villareal, Kaczmarek was readmonished verbally and indicated that he understood his rights. He read and signed an admonishment card. Though Kaczmarek knew that detectives were not willing to accommodate his desire to talk to him in the afternoon, when counsel for his other case would be at CCDC, he also knew that he could get an attorney appointed for questioning and that he did not have to speak with detectives. He was not coerced or threatened into waiving his rights, and he seemed eager to talk with detectives. After giving his waiver, he did not refer to counsel again or ask to stop the interview. He remained calm and spoke freely throughout the relatively short interview. Thus, Kaczmarek's statement was admissible.

Finally, even assuming error in admitting the challenged statement into evidence at trial, Kaczmarek does not show the requisite prejudice.[37] First, the statement was largely cumulative to Kaczmarek's own trial testimony. Second, statements made in violation of *Miranda* but otherwise trustworthy are admissible to impeach the trial testimony of defendants who elect to testify.[38] Thus, to the extent that Kaczmarek's statement differed from his trial testimony with respect to the allegations of participation by "Tommy" and the degree of responsibility Kaczmarek accepted, it would have been admissible for impeachment. Third, in addition to Kaczmarek's own damning testimony, other powerful evidence of his guilt was properly admitted. Kaczmarek's former fellow inmates detailed his repeated admissions to a killing with circumstances similar to the unique circumstances surrounding the Villareal homicide. Scientific evidence showed that DNA consistent with Kaczmarek's own was deposited on a cigarette butt recovered from the crime scene. Other evidence proved that Kaczmarek pawned Villareal's property during the evening of the same day

---

[35]*Davis,* 512 U.S. at 459, 461-62.

[36]*Falcon v. State,* 110 Nev. 530, 534, 874 P.2d 772, 775 (1994) (setting forth standard for determining valid waiver of *Miranda* rights).

[37]*Cf. Green,* 119 Nev. at 545, 80 P.3d at 95.

[38]*See Harris v. New York,* 401 U.S. 222 (1971); *Johnson v. State,* 92 Nev. 405, 551 P.2d 241 (1976).

Villareal was last seen alive and near the time of his death. Our review has left us convinced that any error could not have constituted reversible error under the plain error standard;[39] indeed, it would have even been harmless beyond a reasonable doubt had Kaczmarek objected.[40]

### The district court's overruling of Kaczmarek's Batson objections

Kaczmarek argues that the district court erred in overruling his objections pursuant to *Batson v. Kentucky,*[41] challenging the State's use of four of its eight peremptory challenges to remove members of minority population groups. Kaczmarek states that "the pattern and practice of the prosecution was to remove any 'death penalty skeptics,' *i.e.,* prospective jurors from minority groups who are less likely to impose the death penalty."[42]

Under the equal protection analysis set forth in *Batson,* once the opponent of a peremptory challenge makes a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to give a race-neutral explanation (step two).[43] If such an explanation is given, then the trial court must decide (step three) whether the opponent has proved purposeful racial discrimination.[44] Here, without waiting for a ruling on Kaczmarek's objections, the prosecutor offered reasons for excusing the jurors in question, and the district court overruled Kaczmarek's objection. Therefore, whether Kaczmarek made out a prima facie case (step one) is moot.[45]

[39]*See Green,* 119 Nev. at 545, 80 P.3d at 95.

[40]*See Milton v. Wainwright,* 407 U.S. 371 (1972) (applying harmless-error analysis of *Chapman v. California,* 386 U.S. 18 (1967), to alleged Sixth Amendment right to counsel violation).

[41]476 U.S. 79 (1986).

[42]Kaczmarek also claims in his brief on appeal, as he did in the district court, that no minority group members served on the jury ultimately empaneled. However, at the time of the *Batson* hearing, the State corrected this assertion, without further comment from the court or Kaczmarek, by asserting that two members of minority groups remained on the empaneled jury. The State reasserts this correction on appeal, again without contradiction from Kaczmarek. Because the district court made no factual finding on the issue, we are left with conflicting assertions by the parties. In this instance, resolution of the conflict is unnecessary to our determination on appeal. However, we caution the parties that where disputed factual matters can be readily resolved in the trial court, it is usually vital that the parties seek an appropriate ruling from the trial court to establish an adequate record for appeal.

[43]*Purkett v. Elem,* 514 U.S. 765, 767 (1995).

[44]*Id.*

[45]*See Hernandez v. New York,* 500 U.S. 352, 359 (1991) (plurality opinion); *accord Grant v. State,* 117 Nev. 427, 434, 24 P.3d 761, 766 (2001); *Thomas*

Nevertheless, we address an unsound argument made by the State regarding this step. The State relies on language from our opinion in *Doyle v. State*,[46] which in turn relied on *Batson* and stated that "[t]o establish a prima facie case, the defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." The State suggests that pursuant to *Doyle,* Kaczmarek did not make a prima facie case "[s]ince none of the [challenged] jurors were the same race as [Kaczmarek]." However, *Doyle* overlooked the progress of federal constitutional law holding that a defendant need not belong to the same group as the prospective jurors in order to challenge their exclusion on grounds of discrimination and specifically disavowing *Batson*'s requirement of racial identification between the defendant and excused jurors.[47] Accordingly, we hereby overrule *Doyle*'s prima facie test to the extent it requires similar racial identification.

The second *Batson* step "does not demand an explanation that is persuasive, or even plausible."[48] "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."[49] In this case, the prosecutor explained his reasoning for the peremptory challenges as follows. The first prospective juror stated during voir dire that he did not believe robbery was a serious crime and voiced hesitation about whether he could consider the death penalty. The second and third potential jurors each voiced serious reservations about the validity of the death penalty. The fourth prospective juror indicated, to the prosecutor's surprise, that he had no position on the death penalty even though he had written papers on the subject; the juror continually watched Kaczmarek throughout the proceedings; and the juror's youth and resulting lack of life experience left him at a disadvantage to make the difficult life and death decision. None of these reasons indicate an intent to discriminate, and therefore each is sufficient to satisfy the State's burden under step two.

We now turn to the third step in the *Batson* analysis, in which the persuasiveness of the explanation becomes relevant and the trial

---

*v. State,* 114 Nev. 1127, 1137, 967 P.2d 1111, 1118 (1998); *Doyle v. State,* 112 Nev. 879, 888, 921 P.2d 901, 907 (1996).

[46]112 Nev. at 887, 921 P.2d at 907 (citing *Batson,* 476 U.S. at 96).

[47]*See Powers v. Ohio,* 499 U.S. 400, 416 (1991).

[48]*Elem,* 514 U.S. at 768.

[49]*Hernandez,* 500 U.S. at 360 (plurality opinion).

court must determine whether the opponent of the peremptory challenge has carried his burden of proving purposeful discrimination.[50] "At [this] stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."[51] "[T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible."[52] Because the trial court's findings on the issue of discriminatory intent largely turn on evaluations of credibility, they are entitled to great deference[53] and will not be overturned unless clearly erroneous.[54]

The district court denied Kaczmarek's *Batson* objection, summarily stating, "I think sufficient evidence has been adduced by the State to overcome the shift." We have directed Nevada's district courts to "clearly spell out the three-step analysis" when deciding *Batson*-type issues.[55] At the third step, especially, an adequate discussion of the district court's reasoning may be critical to our ability to assess the district court's resolution of any conflict in the evidence regarding pretext.[56] The court should evaluate all the evidence introduced by each side on the issue of whether race was the real reason for the challenge and then address whether the defendant has met his burden of persuasion.[57] Nonetheless, from the record in this appeal, we conclude that we may properly defer to the district court's determination on the issue of purposeful discrimination.[58]

The prosecutor's reasons for the challenges in question are for the most part supported by the voir dire transcript.[59] We discern no

---

[50]*Elem,* 514 U.S. at 768.

[51]*Id.*

[52]*Miller-El v. Cockrell,* 537 U.S. 322, 339 (2003).

[53]*Id.; Thomas,* 114 Nev. at 1137, 967 P.2d at 1118; *Doyle,* 112 Nev. at 889-90, 921 P.2d at 908.

[54]*Libby v. State,* 115 Nev. 45, 55, 975 P.2d 833, 839 (1999) (citing *Hernandez,* 500 U.S. at 369 (plurality opinion)).

[55]*Id.* at 54, 975 P.2d at 839.

[56]*See Miller-El,* 537 U.S. at 347 (addressing *Batson* claim and stating, "We adhere to the proposition that a state court need not make detailed findings addressing all the evidence before it. This failure, however, does not diminish [the evidence's] significance.").

[57]*See Riley v. Taylor,* 277 F.3d 261, 286 (3d Cir. 2001); *see also Clem v. State,* 104 Nev. 351, 356, 760 P.2d 103, 106 (1988), *overruled on other grounds by Zgombic v. State,* 106 Nev. 571, 798 P.2d 548 (1990).

[58]*See Libby,* 115 Nev. at 54, 975 P.2d at 838-39.

[59]Whether the prosecutor correctly represented the fourth prospective juror's age and tendency to watch Kaczmarek cannot be determined from the record in this appeal.

evidence of disparate questioning of the challenged prospective jurors. The record does not indicate that the State's asserted motives for the challenges were unequally applied to these jurors. Moreover, the prosecutor's reliance on the jurors' reservations about the death penalty does not by itself prove an intent to discriminate; hesitance to impose the death penalty is a permissible and race-neutral reason for exclusion.[60] Furthermore, the use of peremptory challenges will not be held unconstitutional " 'solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required . . . .' "[61] We conclude that Kaczmarek has failed to demonstrate error in the district court's ruling.

*Exclusion of the victim's daughter's opinion on the death penalty*

Before the State presented at the penalty phase the testimony of the victim's daughter Amanda, defense counsel informed the district court that Kaczmarek intended to elicit testimony from Amanda regarding her opposition to a death penalty for Kaczmarek. The district court ruled that Amanda's opinion on sentencing would be excluded. Kaczmarek argues that the district court's ruling violated his constitutional rights to confront witnesses and to present evidence in his defense. We conclude that his contentions lack merit.

The Sixth Amendment right to confront and cross-examine witnesses is applicable to the states through the Fourteenth Amendment's Due Process Clause.[62] Under the Sixth Amendment, a cross-examiner must be permitted to delve into a witness's stories to test perceptions and memory and to impeach the witness.[63] But a district court retains wide discretion to limit cross-examination based on considerations such as harassment, prejudice, confusion of the issues, and relevancy.[64] Here, Amanda's di-

---

[60]*See Miller-El,* 537 U.S. at 343; *Thomas,* 114 Nev. at 1137, 967 P.2d at 1118; *Browning v. State,* 104 Nev. 269, 272, 757 P.2d 351, 353 (1988); *see also Leonard v. State,* 114 Nev. 1196, 1205, 969 P.2d 288, 294 (1998) (and cases cited therein).

[61]*Hernandez,* 500 U.S. at 359-60, 361-63 (plurality opinion) (quoting *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 264-65 (1977)); *see also Doyle,* 112 Nev. at 890-91, 921 P.2d at 909.

[62]*See* U.S. Const. amends. VI, XIV; *Delaware v. Fensterer,* 474 U.S. 15, 19 (1985); *Barber v. Page,* 390 U.S. 719, 721 (1968).

[63]*See Fensterer,* 474 U.S. at 19; *see also* NRS 50.115(2) (generally limiting cross-examination to subject matter of direct examination and matters affecting witness's credibility).

[64]*See Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986), *cited in Leonard,* 117 Nev. at 72, 17 P.3d at 409; *see also Dyer v. State,* 99 Nev. 422, 425, 663 P.2d 699, 701 (1983).

rect testimony was limited to the subject of her father's personal characteristics and the impact that his death had on her. Her opinion on sentencing would not have shed any additional light on these subjects, and it was not relevant to issues of credibility or potential bias. Thus, we conclude that the district court's ruling did not violate Kaczmarek's confrontation right.

Next, the constitutional right to present witnesses in defense of a prosecution derives from the Compulsory Process Clause of the Sixth Amendment and the Fourteenth Amendment's due process guarantee of a fair trial.[65] The right is limited, however, by the rule of relevance and " 'does not require that the defendant be permitted to present every piece of evidence he wishes.' "[66]

In considering whether Kaczmarek was denied the right to present evidence relevant to his defense, we recognize that the crux of his claim rests in part upon the concomitant right to present evidence in mitigation.[67] The Eighth and Fourteenth Amendments demand that "a sentencer in a capital case must not be precluded from considering as a mitigating factor ' "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." ' "[68] This constitutional rule does not, however, limit " 'the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.' "[69]

In Nevada, the right to present evidence in mitigation is also governed by statutory law. In particular, NRS 175.552(3) provides

[65]*See* U.S. Const. amends. VI, XIV; *California v. Trombetta,* 467 U.S. 479, 485 (1984); *Chambers v. Mississippi,* 410 U.S. 284, 294, 302 (1973); *Washington v. Texas,* 388 U.S. 14 (1967); *Williams v. State,* 110 Nev. 1182, 1184-85, 885 P.2d 536, 537-38 (1994).

[66]*Brown v. State,* 107 Nev. 164, 167, 807 P.2d 1379, 1381 (1991) (quoting *State v. Cassidy,* 489 A.2d 386, 391 (Conn. App. Ct. 1985)).

[67]*See Green v. Georgia,* 442 U.S. 95, 97 (1979); *Paxton v. Ward,* 199 F.3d 1197, 1213-16 (10th Cir. 1999); *Boyd v. Ward,* 179 F.3d 904, 921 (10th Cir. 1999); *see also Robison v. Maynard,* 829 F.2d 1501, 1503-05 (10th Cir. 1987) (addressing challenge to exclusion of opinions against death penalty in context of constitutional rules applicable to mitigating evidence), *overruled on other grounds by Romano v. Gibson,* 239 F.3d 1156 (10th Cir. 2001).

[68]*Harte,* 116 Nev. at 1069, 13 P.3d at 430 (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio,* 438 U.S. 586, 604 (1978) (plurality opinion of Burger, C. J.)), and citing *Skipper v. South Carolina,* 476 U.S. 1, 4 (1986)).

[69]*Id.* (quoting *Lockett,* 438 U.S. at 604 n.12) (plurality opinion of Burger, C. J.)).

that at capital penalty hearings "evidence may be presented concerning . . . mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible." NRS 200.035(1)-(6) lists certain mitigating circumstances applicable to first-degree murder, and NRS 200.035(7) provides for consideration of "[a]ny other mitigating circumstance." But we have held that "neither NRS 175.552(3) nor NRS 200.035(7) requires the district court to admit evidence that is not required to be admitted pursuant to constitutional dictates."[70]

Other courts have soundly rejected claims that the constitutional rules applicable to mitigating evidence require admission of opinions in favor of a sentence less than death.[71] As recognized by the Tenth Circuit Court of Appeals in the leading decision on the issue, *Robison v. Maynard*,[72] such evidence is irrelevant to appropriate sentencing considerations including mitigation. The court explained:

> An individual's personal opinion of how the sentencing jury should acquit its responsibility, even though supported by reasons, relates to neither the character or record of the defendant nor to the circumstances of the offense. Such testimony, at best, would be a gossamer veil which would blur the jury's focus on the issue it must decide.[73]

We agree with this analysis and note that we applied analogous reasoning in *Harte*[74] to uphold on grounds of irrelevancy the exclusion of testimony on various religions' objections to the death penalty, which the defendant had proffered as mitigation. In the instant case, we similarly conclude that because Amanda's opinion on sentencing is irrelevant to Kaczmarek's character, his record, or the circumstances of her father's murder, the district court was not required to admit the opinion as evidence in mitigation.

Next, we address the district court's analysis of the issue here as one involving the parameters of admissible victim impact testimony

---

[70]*Id.* at 1070, 13 P.3d at 431.

[71]*See, e.g., Robison,* 829 F.2d at 1504-05; *Taylor v. State,* 666 So. 2d 36, 51-53 (Ala. Crim. App. 1994); *Greene v. State,* 37 S.W.3d 579, 583-85 (Ark. 2001); *People v. Smith,* 68 P.3d 302, 330 (Cal. 2003), *cert. denied,* 540 U.S. 1163 (2004); *Ware v. State,* 759 A.2d 764, 783-86 (Md. 2000); *State v. Bowman,* 509 S.E.2d 428, 440 (N.C. 1998); *Com. v. Bomar,* 826 A.2d 831, 851-52 (Pa. 2003), *cert. denied,* 540 U.S. 1115 (2004); *State v. Gardner,* 789 P.2d 273, 286 (Utah 1989); *State v. Pirtle,* 904 P.2d 245, 268-69 (Wash. 1995).

[72]829 F.2d 1501.

[73]*Id.* at 1505.

[74]116 Nev. at 1068-70, 13 P.3d at 429-31.

under case law which stems from *Booth v. Maryland.*[75] In *Booth,* the United States Supreme Court held that the Eighth Amendment, binding upon the states by way of the Fourteenth Amendment's Due Process Clause,[76] bars the prosecution at a capital penalty proceeding from presenting victim impact evidence addressing: (1) the emotional distress of the victim's family and the personal characteristics of the victim, as well as (2) the family members' emotionally charged characterizations of the crimes and opinions as to what conclusion the jury should draw from the evidence.[77] The Court reasoned that such information is irrelevant to the sentencing decision and creates an unacceptable risk of arbitrary and capricious decision making.[78] In *South Carolina v. Gathers,*[79] the Court extended *Booth* to prosecutors' arguments.

Subsequently, in *Payne v. Tennessee,*[80] the Court overruled *Booth* and *Gathers,* in part, and held that there is no per se Eighth Amendment bar to a capital jury's consideration of a prosecutor's argument or evidence related to the victim's personal characteristics or the emotional impact of the crime on the victim's family. The Court reasoned that such evidence serves to level the balance between a defendant's right to show ''relevant mitigating evidence'' and the government's interest in demonstrating the harm caused by the defendant's acts.[81] However, the Court left intact *Booth*'s prohibition on ''admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence'' by limiting its removal of the per se bar to ''evidence and argument relating to the victim and the impact of the victim's death.''[82]

In *Homick v. State,*[83] we recognized and applauded *Payne*'s attempt to rectify the imbalance between the parties' legitimate interests. We have continued to apply *Payne* to allow evidence showing the victim's character and the impact of the crimes on the victim's family.[84] We have held that the district courts have discretion to admit such evidence under NRS 175.552, so long as it does not

---

[75]482 U.S. 496 (1987), *overruled in part by Payne v. Tennessee,* 501 U.S. 808 (1991).

[76]*See* U.S. Const. amends. VIII, XIV; *Robinson v. California,* 370 U.S. 660, 666 (1962).

[77]*Booth,* 482 U.S. at 502-09.

[78]*Id.*

[79]490 U.S. 805 (1989), *overruled in part by Payne,* 501 U.S. 808.

[80]501 U.S. at 827-30.

[81]*Id.* at 822-27.

[82]*Id.* at 830 n.2.

[83]108 Nev. 127, 136-37, 825 P.2d 600, 606 (1992).

[84]*See, e.g., Rippo v. State,* 113 Nev. 1239, 1261, 946 P.2d 1017, 1031 (1997); *Atkins v. State,* 112 Nev. 1122, 1136, 923 P.2d 1119, 1128 (1996); *McNelton v. State,* 111 Nev. 900, 906 & n.4, 900 P.2d 934, 937 & n.4 (1995).

render the proceeding fundamentally unfair.[85] But, as *Booth* still demands pursuant to the Eighth Amendment, we have also recognized that ''[a] victim can express an opinion regarding the defendant's sentence only in noncapital cases.''[86]

We digress briefly here to discuss the State's conduct with respect to the issue at hand. In its appellate brief, the State argued that victim impact witnesses' opinions on capital case sentencing are precluded only by Nevada case law. The State further contended, erroneously, that this restriction is unwarranted because *Payne* removed the federal constitutional bar to such evidence. Because the State wished to present victim impact witnesses' opinions in favor of death sentences, it urged us to prospectively overrule our ''judicially created limitation'' for capital penalty proceedings and thereby allow admission into evidence of *all* victim impact witnesses' opinions on the appropriate penalty.

This court expended its limited resources assessing the merits of the State's contentions in preparation for the parties' oral arguments. This was a needless effort because at oral argument the State agreed that *Payne* does not allow victims to tender opinions on sentence. The State sought to brush off its change in tack by explaining that it had ''vented a little bit'' in its previously filed brief. However, we do not take these circumstances so lightly. Counsel is required to certify that he has read the briefs that he signs and files with this court and is prohibited from asserting an issue which he knows is frivolous.[87] Thus, we presume that the issues raised in the briefs deserve our careful attention. When a party raises arguments for a frivolous purpose such as venting, judicial resources are squandered. Accordingly, we caution the State that similar future carelessness in briefing may be followed by sanctions.

The State now correctly concedes that it may not, pursuant to *Payne,* introduce a victim impact witness's opinion on sentencing at a capital penalty proceeding, but this point is not pivotal here. The Eighth Amendment protects *criminal defendants* by providing that ''[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.''[88] Hence, the Eighth Amendment holdings of *Booth* and *Payne,* which we have in-

---

[85]*Floyd v. State,* 118 Nev. 156, 174, 42 P.3d 249, 261 (2002), *cert. denied,* 537 U.S. 1196 (2003); *see also McNelton,* 111 Nev. at 905-06, 900 P.2d at 937-38.

[86]*Gallego v. State,* 117 Nev. 348, 370, 23 P.3d 227, 242 (2001); *Rippo,* 113 Nev. at 1261, 946 P.2d at 1031; *Witter v. State,* 112 Nev. 908, 922, 921 P.2d 886, 896 (1996), *receded from on other grounds by Byford v. State,* 116 Nev. 215, 994 P.2d 700 (2000).

[87]*See* NRAP 28A; SCR 170.

[88]U.S. Const. amend. VIII.

tegrated into Nevada case law, restrict only the *prosecution's* ability to present a victim's family's views on punishment and do not expressly address or limit the admissibility of similar evidence tendered by a defendant.[89] Still, neither *Booth* nor *Payne* creates a right for a defendant ''to do what the prosecution may not do.''[90]

We join our sister courts in rejecting the proposition that opinions in opposition to the death penalty fall within the parameters of admissible victim impact testimony or rebuttal thereto.[91] Such opinions are not relevant to issues that may be appropriately addressed by victim impact testimony, *i.e.,* the victim's personal characteristics and the emotional impact of the victim's death. Thus, Kaczmarek had no constitutional or statutory right to present evidence of Amanda's views on sentencing, and we conclude that the district court did not err in excluding her testimony on the matter.

Finally, it is beyond doubt that jurors in this case were moved by young Amanda's victim impact testimony related to her father's characteristics and the emotional devastation she suffered from the murder. However, the admission of this testimony did not result in fundamental unfairness to Kaczmarek.[92] Nor is there any evidence that the jury based its determination on any improper speculation. The district court instructed the jury that victim impact witnesses are not permitted to speak on the issue of sentence and that it should fix punishment based on the evidence alone and not on inferences founded on speculation or guess. We presume that the jury followed these instructions.[93]

*Mandatory review under NRS 177.055(2)*

This court must conduct a mandatory review pursuant to NRS 177.055(2)(c)-(e) to determine ''[w]hether the evidence supports

[89]*See Payne,* 501 U.S. at 818-19 (recognizing that *Booth* rule prevents *prosecution* from introducing certain victim impact evidence). *See generally Smith,* 68 P.3d at 330.

[90]*Smith,* 68 P.3d at 330.

[91]*See, e.g., Robison v. Maynard,* 943 F.2d 1216, 1217-18 (10th Cir. 1991); *Barbour v. State,* 673 So. 2d 461, 468-69 (Ala. Crim. App. 1994), *judgment aff'd,* 673 So. 2d 473 (Ala. 1995); *Greene,* 37 S.W.3d at 585-86; *Smith,* 68 P.3d at 329-30; *Ware,* 759 A.2d at 783-86; *Gardner,* 789 P.2d at 286; *Pirtle,* 904 P.2d at 269.

[92]*Cf. McNelton,* 111 Nev. at 906-07, 900 P.2d at 937-38 (holding that admission of evidence showing murder victim was pregnant, though prejudicial, did not render sentencing fundamentally unfair).

[93]*Lisle v. State,* 113 Nev. 540, 558, 937 P.2d 473, 484 (1997) (recognizing that this court presumes that juries follow district courts' instructions).

the finding of an aggravating circumstance or circumstances'' and whether the death sentence ''was imposed under the influence of passion, prejudice or any arbitrary factor'' or ''is excessive, considering both the crime and the defendant.''

We conclude that the evidence adduced here supports the jury's finding of each of the three aggravators. However, our review for improper influence affecting the jury's sentencing determination reveals that during the penalty phase the State adduced improper victim impact testimony from the victim of Kaczmarek's prior Illinois crimes. Although the majority of this witness's testimony was relevant and admissible to prove the aggravator that ''the murder was committed by a person who has previously been convicted of a felony involving the use or threat of violence,'' the witness did not confine her testimony to proof of the alleged aggravator. Rather, she testified at some length to the tragic toll the crimes had taken upon her life. We have held that evidence of the impact to victims of prior crimes alleged as aggravating circumstances is not relevant to the sentencing decision in a first-degree murder case, and therefore such evidence is inadmissible during the penalty phase.[94] The district court erred in admitting the victim impact testimony related to Kaczmarek's prior Illinois crimes. Even so, the jury would have surmised from the witness's admissible testimony that she would have suffered greatly following Kaczmarek's horrendous crimes against her. Moreover, based on the evidence here, we are convinced that the jury's verdict was not improperly influenced by the inappropriate testimony. Finally, the senseless and callous nature of the instant crimes, Kaczmarek's prior record of violence and disregard for the law, and the dearth of mitigating evidence lead us to conclude that the sentence of death is not excessive.[95]

## CONCLUSION

For the foregoing reasons, we affirm Kaczmarek's judgment of conviction and sentence of death.[96]

[94]See Sherman v. State, 114 Nev. 998, 1014, 965 P.2d 903, 914 (1998).

[95]Cf. Colwell v. State, 112 Nev. 807, 919 P.2d 403 (1996) (upholding death penalty under similar circumstances).

[96]Kaczmarek argued in his brief to this court that insufficient evidence supported his conviction for first-degree kidnapping. However, at oral argument he conceded that this issue has no merit. We agree. See NRS 200.310(1); Doyle v. State, 112 Nev. at 892-93, 921 P.2d at 910-11; Hutchins v. State, 110 Nev. 103, 108-09, 867 P.2d 1136, 1140 (1994); Beets v. State, 107 Nev. 957, 962, 821 P.2d 1044, 1048 (1991).