134 Nev., Advance Opinion 83

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| GREGORY ANTHONY WILLIAMS,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 70868<br><br>**FILED**<br><br>OCT 25 2018<br><br>ELIZABETH A. BROWN<br>CLERK OF SUPREME COURT<br>BY_____<br>CHIEF DEPUTY CLERK |

Appeal from a judgment of conviction, pursuant to a jury verdict, of six counts of lewdness with a child under the age of 14 and three counts of sexual assault with a minor under 14 years of age. Eighth Judicial District Court, Clark County; Douglas Smith, Judge.

*Reversed and remanded.*

Howard Brooks, Public Defender, and Audrey M. Conway and Kevin Charles Speed, Deputy Public Defenders, Clark County,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Jonathan VanBoskerck, Chief Deputy District Attorney, and Stacy L. Kollins, Deputy District Attorney, Clark County,
for Respondent.

_____

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, PICKERING, J.:

The United States Constitution prohibits parties from exercising peremptory challenges to exclude jurors on the basis of race.

18-42112

When a defendant claims that the State has removed a potential juror because of the juror's race, the law requires the district judge to conduct a three-step inquiry. If, after conducting the inquiry, the district judge finds no unlawful discrimination occurred, we give great deference to the district court's finding and will only reverse if the district court clearly erred. But where, as here, the court fails to properly engage that inquiry, and it appears more likely than not that the State struck the juror because of her race, we must reverse and remand for a new trial.

## I.

Gregory Williams was convicted of lewdness and sexual assault with a minor under the age of 14—six counts in all—for sexual misconduct involving his girlfriend's two daughters. Four of the counts were based on the sexual assault and touching of T.H., a 10-year-old girl, and the other two counts were based on lewdness with A.H., who was 12. T.H. testified at trial that Williams anally and vaginally penetrated her with his penis on three separate occasions, and touched her vagina, butt, and breasts on another. Rectal swabs taken from T.H. contained both sperm material and protein found in semen, and were consistent with Williams's DNA. A.H. also testified that Williams once lifted up her shirt and sucked on her breasts, and that another time Williams lifted up her shirt halfway but then stopped after she began to cry.

On appeal, Williams argues multiple errors in his trial require reversal, but we address only two of his arguments in this opinion. First, Williams argues, and we agree, that the district court clearly erred in denying his *Batson* challenge to the State's use of a peremptory strike to remove an African-American woman from the venire. Second, Williams argues that he should have been allowed to present evidence that the two

(O) 1947A

young girls had the ability to contrive sexual allegations due to exposure to sexual information in the girls' home—or, at the least, that the district court should have let him question the girls under oath outside the presence of the jury to understand their knowledge of their mother's career in the pornographic film industry and their exposure to sexual information in the home. We agree that Williams should have received a hearing, and set forth the procedure to follow in determining whether to admit evidence to show that a young victim could have contrived sexual allegations.

## II.

During jury selection, the State exercised a peremptory strike to remove prospective Juror No. 23, an African-American woman. Williams made a *Batson* challenge to the peremptory strike, claiming that Juror 23 was unconstitutionally removed due to her race. Under *Batson v. Kentucky*, the use of a peremptory strike to remove a potential juror on the basis of race is unconstitutional. 476 U.S. 79, 86 (1986). If established, such discrimination in the jury-selection process constitutes structural error requiring reversal. *Diomampo v. State*, 124 Nev. 414, 423, 185 P.3d 1031, 1037 (2008).

When analyzing a *Batson* challenge at trial, a district court must engage in a three-step process. *See Batson*, 476 U.S. at 93-100; *Kaczmarek v. State*, 120 Nev. 314, 332-35, 91 P.3d 16, 28-30 (2004). First, the opponent of the peremptory strike "must make a prima facie showing that a peremptory challenge has been exercised on the basis of race." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 277 (2005) (Thomas, J., dissenting)); *Kaczmarek*, 120 Nev. at 332-33, 91 P.3d at 29. Second, if that showing has been made, the proponent of the peremptory strike must present a race-neutral explanation for the

strike. *Snyder*, 552 U.S. at 477; *Kaczmarek*, 120 Nev. at 333, 91 P.3d at 29. Finally, the court should hear argument and determine whether the opponent of the peremptory strike has proven purposeful discrimination. *Id.* at 333-34, 91 P.3d at 29-30. Because the district court is in the best position to rule on a *Batson* challenge, its determination is reviewed deferentially, for clear error. *Id.* at 334, 91 P.3d at 30.

We have repeatedly implored district courts to adhere to this three-step analysis and clearly spell out their reasoning and determinations. *See Libby v. State*, 115 Nev. 45, 54, 975 P.2d 833, 839 (1999) ("We take this opportunity to instruct the district courts of this state to clearly spell out the three-step analysis when deciding a *Batson* . . . issue."); *Kaczmarek*, 120 Nev. at 334, 91 P.3d at 30 ("We have directed Nevada's district courts to 'clearly spell out the three-step analysis' when deciding *Batson*-type issues."); *McCarty v. State*, 132 Nev. 218, 230, 371 P.3d 1002, 1010 (2016) ("Although the three-step *Batson* analysis is firmly rooted in our jurisprudence, we continue to see that analysis not being followed.") (Douglas, J., concurring). Yet district courts continue to shortchange *Batson* challenges and scrimp on the analysis and findings necessary to support their *Batson* determinations. We take this opportunity to, yet again, urge district courts to follow the three-step *Batson* procedure.

## A.

The first step of a *Batson* challenge requires the party challenging the peremptory strike to make a prima facie showing of purposeful discrimination. *Batson*, 476 U.S. at 93. To make a prima facie showing of discrimination, the defendant must do more than point out that a member of a cognizable group was struck. *See Watson v. State*, 130 Nev. 764, 776, 335 P.3d 157, 166 (2014) ("[T]he mere fact that the State used a

peremptory challenge to exclude a member of a cognizable group is not, standing alone, sufficient to establish a prima facie case of discrimination under *Batson*'s first step; 'something more' is required."). The defendant must show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94. This showing is not onerous, nor does it require the defendant to meet the ultimate burden of proof. *See Watson*, 130 Nev. at 775, 335 P.3d at 166. The defendant may make this showing by demonstrating a pattern of discriminatory strikes, but a pattern is not necessary and is not the only means by which a defendant may raise an inference of purposeful discrimination. *Id.* at 776, 335 P.3d 166. Other evidence a defendant might present could include "the disproportionate effect of peremptory strikes, the nature of the proponent's questions and statements during voir dire, disparate treatment of members of the targeted group, and whether the case itself is sensitive to bias." *Id.* at 776, 335 P.3d at 167.

Here, Williams argued that Juror 23 was one of eight African-American venire members, that the State used its second peremptory strike on her, and that given her answers in voir dire, she was excused solely because of her race. Before the court determined whether Williams made a prima facie showing of purposeful discrimination, the State interjected, objecting that Williams himself had excused an African-American veniremember for cause, and that there was no pattern of discrimination. The State went on, saying "[t]he State does have a race-neutral reason for excluding that juror, but does not feel that it's required to put on the record right now because no pattern has been shown that we've exhibited." Nonetheless, the State did offer a reason for Juror 23's exclusion before the district court determined whether Williams established a prima facie

SUPREME COURT
OF
NEVADA

(O) 1947A

showing of purposeful discrimination. Thus, while the record indicates the district court intimated that it would ask the State for a race-neutral explanation after Williams completed his argument, the district court never actually determined whether Williams raised an inference of purposeful discrimination. Where, as here, the State provides a race-neutral reason for the exclusion of a veniremember before a determination at step one, the step-one analysis becomes moot and we move to step two. *See Hernandez v. New York*, 500 U.S. 352, 359 (1991); *Ford v. State*, 122 Nev. 398, 403, 132 P.3d 574, 577 (2006); *Kaczmarek*, 120 Nev. at 332, 91 P.3d at 29.

## B.

At step two, the burden shifts to the State to provide a race-neutral reason for the veniremember's exclusion. *Batson*, 476 U.S. at 97. The State's reason cannot be that the veniremember may be biased due to his or her race. *Id.* Nor can the prosecutor rebut the defendant's prima facie showing by denying a discriminatory motive or making general assertions as to his or her integrity and professional reputation. *Id.* at 98. Under this step, the prosecutor's explanation only needs to be race neutral; it does not need to be "persuasive, or even plausible." *Diomampo*, 124 Nev. at 422, 185 P.3d at 1036 (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)). At this point, the district court should determine only whether the prosecutor has offered an ostensibly race-neutral explanation for the peremptory strike; it should not make an ultimate determination on the *Batson* challenge until conducting the sensitive inquiry required by step three. *See United States v. Rutledge*, 648 F.3d 555, 559 (7th Cir. 2011) ("The analytical structure established by *Batson* cannot operate properly if the second and third steps are conflated.").

In this case, the State said that it struck Juror 23, who is a physician's assistant in neurosurgery, because the juror expressed the opinion that sometimes "science gets it wrong, even though she's a doctor." Additionally, the State claimed that Juror 23's demeanor suggested that she would not "deliberate in the group effectively"; she "was closed off"; "her answers were short, [and] she was unwilling to communicate much more than yes or no answers." Each of these is a race-neutral explanation for the State's exercise of its peremptory challenge. This is the end of the inquiry at step two; the court should not weigh the merit of the State's reason, or the strength of the defendant's prima facie showing at this step. *See Purkett*, 514 U.S. at 768 ("It is not until the *third* step that the persuasiveness of the justification becomes relevant . . . .").

## C.

In the final step, the district court must determine whether the defendant has proven purposeful discrimination. *Batson*, 476 U.S. at 98. "The district court 'must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available' and 'consider all relevant circumstances' before ruling on a *Batson* objection and dismissing the challenged juror." *Conner v. State*, 130 Nev. 457, 465, 327 P.3d 503, 509 (2014) (quoting *Batson*, 476 U.S. at 96). Relevant considerations at step three might include:

> (1) the similarity of answers to voir dire questions given by jurors who were struck by the prosecutor and answers by those jurors of another race or ethnicity who remained in the venire, (2) the disparate questioning by the prosecutors of struck jurors and those jurors of another race or ethnicity who remained in the venire, (3) the prosecutors' use of the "jury shuffle," and (4) "evidence of historical

SUPREME COURT
OF
NEVADA

(O) 1947A

discrimination against minorities in jury selection by the district attorney's office."

*McCarty*, 132 Nev. at 226-27, 371 P.3d at 1007-08 (citing *Hawkins v. State*, 127 Nev. 575, 578, 256 P.3d 965, 967 (2011)). "The district court should sustain the *Batson* objection and deny the peremptory challenge if it is 'more likely than not that the challenge was improperly motivated.'" *Id.* at 227, 371 P.3d at 1008 (quoting *Johnson v. California*, 545 U.S. 162, 170 (2005)). Generally, the district court's determination is akin to a finding of fact and is "accorded great deference on appeal." *Walker v. State*, 113 Nev. 853, 867-88, 944 P.2d 762, 771-72 (1997) (quoting *Hernandez*, 500 U.S. at 364).

The district court failed to follow these rules in deciding Williams's *Batson* challenge. Immediately after the State provided its race-neutral reason for excluding Juror 23, the district court made its ultimate decision: "I find it was race-neutral. I don't think it was because of race, but I also noticed that you, [defense counsel], kicked an African American lady off first." The district court was referring to a prospective juror Williams removed for cause, meaning the juror was in some way unqualified to sit on the jury. *See* NRS 16.050 (listing the grounds for challenges for cause). Williams then had to ask for the benefit of the third step of a *Batson* analysis, requesting that the district court allow him to respond to the State's race-neutral explanation.

Williams should not have had to ask the district court to conduct step three of the *Batson* analysis. The "sensitive inquiry" required by step three necessarily includes the district court giving the defendant the opportunity to challenge the State's proffered race-neutral explanation as pretextual. *See Hawkins*, 127 Nev. at 578, 256 P.3d at 967 ("Failing to traverse an ostensibly race-neutral explanation for a peremptory challenge as pretextual in the district court stymies meaningful appellate

 

review . . . ."); *State v. Lamon*, 664 N.W.2d 607, 616 (Wis. 2003) ("As part of this third step, a defendant may show that the reasons proffered by the State are pretexts for racial discrimination."). And where the district court makes its decision before hearing such argument from the defendant, it raises concerns as to the fairness of the proceeding. *Cf. Buchanan v. State*, 130 Nev. 829, 833, 335 P.3d 207, 210 (2014) (predetermining a challenge creates the appearance of improper judicial bias); *Brass v. State*, 128 Nev. 748, 750, 291 P.3d 145, 147 (2012) (requiring reversal when the district court excused a juror prior to holding a hearing on defense's *Batson* challenge).

Worse, the district court never conducted the sensitive inquiry required by step three. *See Kaczmarek*, 120 Nev. at 334, 91 P.3d at 30 ("At the third step, especially, an adequate discussion of the district court's reasoning may be critical to our ability to assess the district court's resolution of any conflict in the evidence regarding pretext."); *see also McCarty*, 132 Nev. at 229, 371 P.3d at 1009 (same). Instead, all the district court said was this: "I don't find the State based it on race."

This record does not allow meaningful, much less deferential review. The State's race-neutral explanation for striking Juror 23 included two parts: (1) Juror 23's agreement with defense counsel's statement expressing doubt about the infallibility of scientific evidence; and (2) her "closed-off" demeanor. The outcome of a *Batson* challenge often turns upon the demeanor of the prosecutor exercising the strike, and the demeanor of the juror being struck—determinations that lie uniquely within the province of the district judge. *See Hernandez*, 500 U.S. at 365 ("As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'")

(quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)); *Reynolds v. United States*, 98 U.S. 145, 156-57 (1878) ("[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record."). Because the district court interacts with the juror and the prosecutor, and sees their interactions first-hand, an appellate court defers to the district court's demeanor determinations. *See Walker*, 113 Nev. at 867-68, 944 P.2d at 771-72; *cf. Graves v. State*, 112 Nev. 118, 124, 912 P.2d 234, 238 (1996) ("The cold record is a poor substitute for demeanor observation.").

But where only part of the basis for a peremptory strike involves the demeanor of the struck juror, and the district court summarily denies the *Batson* challenge without making a factual finding as to the juror's demeanor, we cannot assume that the district court credited the State's demeanor argument. *See Snyder v. Louisiana*, 552 U.S. 472, 479 (2008) (not acknowledging the prosecution's demeanor argument where the trial judge was given two explanations for the strike and "simply allowed the challenge without explanation"); *Roach v. State*, 79 N.E.3d 925, 931 (Ind. Ct. App. 2017) ("It is impossible for us to determine which reason the trial court used to deny the *Batson* challenge or if it found both reasons persuasive."). If demeanor had been the only race-neutral explanation the State offered for its strike, and the district court denied the *Batson* challenge, this would be a different case. *Compare, e.g., United States v. Thompson*, 735 F.3d 291, 300 (5th Cir. 2013) ("*Snyder* does not require a district court to make record findings of a juror's demeanor where the prosecutor justifies the strike based on demeanor alone."), *with United States v. McMath*, 559 F.3d 657, 666 (7th Cir. 2009) ("*Snyder* makes clear

SUPREME COURT
OF
NEVADA

(O) 1947A

that a summary denial does not allow us to assume that the prosecution's reason was credible; rather, the district court's silence leaves a void in the record that does not allow us to affirm the denial."). But where the State offers two explanations for the strike, one of which appears implausible, and the other is a demeanor argument that is disputed by the defendant, there is no basis to assume that the district court based its denial on the State's demeanor argument. *See Snyder*, 552 U.S. at 479. Such is the case here.

The State's non-demeanor argument—that Juror 23 expressed skepticism regarding science—appears pretextual. Juror 23 is a physician's assistant in neurosurgery. During voir dire, Juror 23 acknowledged defense counsel's assertion that sometimes "science gets it wrong" and that the results of a test using technology, for example a pathology report of a tumor, can be incorrect.[1] This seems like a reasonable concession, and several other jurors also expressed similar, and sometimes stronger, concerns.

---

[1]In relevant part, defense counsel's voir dire of Juror 23 reads as follows:

> [Defense Counsel]: Sometimes the science gets it wrong, doesn't it?
>
> [Juror 23]: Yes.
>
> [Defense Counsel]: And sometimes even with all the most advanced technology, the most sophisticated instruments, a neurosurgeon relying on those instruments may not see what the instruments are telling you to see?
>
> [Juror 23]: I'm not sure I understand your question.
>
> [Defense Counsel]: With all the advancements in medical science that we have, the ability for a brain surgeon to let's say have a CT scan done on someone, they're trying to detect the presence of a

tumor for example and the doctor—the physician's assistant sees something on the scan that indicates yeah, there's probably something there. We might want to take some action quickly. You schedule the person for a hospital visit, you do more tests, you do more exams but you find out there was nothing there. Has that ever happened to you?

[Juror 23]: No. That nothing was there if you saw it there?

[Defense Counsel]: Well, let me ask you this way.

[Juror 23]: That's not really a medical question.

[Defense Counsel]: What you say thinking was a tumor, something exceedingly dangerous, ended up being something benign.

[Juror 23]: That's correct. That can happen.

[Defense Counsel]: And when you're looking at this, what eventually turned out to be a benign mass, the first time that you look at it and you think it's a tumor, the doctor thinks it's a tumor, the examination team all think it's a tumor, you react and respond and behave and take steps to heal that patient, right?

[Juror 23]: Yes.

[Defense Counsel]: Because you're relying on your instruments, your tools, right to make the diagnosis?

[Juror 23]: We're relying on pathology to make the diagnosis.

[Defense Counsel]: So in these kinds of case [sic], wouldn't you agree with me—would it be fair to say that when we think we see something on a piece of technology or a tool, it may not be what the tool is saying it is. You've got a little bit more work.

[Juror 23]: That is correct.

In the district court, Williams argued that other jurors, particularly Jurors 25 and 36—both white men—shared Juror 23's acknowledgment about the fallibility of science. The State responds that its failure to strike Jurors 25 and 36 proves nothing, because Williams struck those veniremembers, making it impossible to tell whether the State would have struck them if Williams had not. The State also argues on appeal that other jurors' answers "did not convey a skepticism of scientific evidence as much as they reflected an appreciation of the reality that scientific testing can sometimes result in errors." We find the State's argument unpersuasive, and not supported by the record.

At least three other jurors, in addition to the two Williams identified at trial, provided answers similar to Juror 23's. Juror 28 said that "when there's a human element involved, there's a chance that mistakes can be made" and allowed that "there can be instances" where science does not say what humans think it says. Similarly, Juror 46 discussed chemical flaws and reactions in the use of pregnancy tests with defense counsel, and acknowledged that pregnancy tests can sometimes give an incorrect result. And just before the State exercised its peremptory strike on Juror 23, Juror 44 expressed concern about the fallibility of DNA evidence and technological tools. All of these responses were elicited by defense counsel, and the State did not follow up or question jurors along these lines. That the State failed to follow up on this line of questioning with Juror 23, and did not strike other jurors who expressed skepticism similar to Juror 23's, suggests pretext. *See Diomampo*, 124 Nev. at 425, 185 P.3d at 1038; *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("If a prosecutor's

---

[Defense Counsel]: Thank you, [Juror 23], I appreciate it.

SUPREME COURT
OF
NEVADA

(O) 1947A

proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."); *Conner*, 130 Nev. at 466, 327 P.3d at 510 ("A race-neutral explanation that is belied by the record is evidence of purposeful discrimination.").

Without a finding from the district court, the record by itself does not support the State's demeanor argument. In fact, to the extent the cold record provides any insight into Juror 23's demeanor, it seems to contradict the State's assertions. While the State argued that Juror 23 was "closed off" and gave short answers, the record shows that Juror 23 gave short answers when appropriate and elaborated on other answers when appropriate. At one point during the State's questioning, Juror 23 even offered humor, saying she would not do outside research on the case because she did not want to reopen her biology books from school. Thus, the record does not allow us to credit the State's argument that Juror 23's demeanor indicated that she would not be able to deliberate effectively in a group, as opposed to Williams's argument that many other jurors exhibited the same demeanor as Juror 23.

The human, social, and economic costs of a reversal and retrial are substantial. But *Batson* has been the law for more than 30 years. "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster v. Chatman*, ___ U.S. ___, 136 S. Ct. 1737, 1747 (2016) (quoting *Snyder*, 552 U.S. at 478) (internal quotation marks omitted). Given the district court's mishandling of Williams's *Batson* challenge, and the pretextual nature of at least part of the State's race-neutral explanation for striking Juror 23, the district court clearly

Supreme Court
of
Nevada

(O) 1947A

erred in denying Williams's *Batson* challenge. This constitutes structural error, requiring us to reverse and remand for a new trial.

### III.

We turn next to the procedure for admitting or excluding evidence to show that a young victim had the knowledge to contrive sexual allegations, as this issue will recur on retrial. Williams sought to present evidence that the two young girls, 10 and 12 years old, knew enough about sex to have fabricated their allegations. Specifically, Williams sought to present evidence that the girls' mother sold sex toys and performed in pornographic films from their home. The State objected that admitting this evidence would violate the rape shield statute, NRS 50.090, which generally prevents a defendant from using evidence of past sexual conduct to challenge the victim's credibility. Additionally, despite A.H.'s statement that her mother was a "porn star," T.H.'s statement that she had seen pornography, and T.H.'s testimony that she saw "naked pictures" on the television during one of the assaults, the State argues that there was no evidence that the girls knew about their mother's career.

The district court initially scheduled a hearing—where T.H. and A.H. would testify under oath—to determine what the girls knew about their mother's career, if anything. But the day before the hearing, defense counsel went to the girls' school and interviewed A.H. and T.H. without their mother's presence or permission. The district court found that Williams had prejudiced the hearing and canceled it, noting that Williams could renew his motion later. Williams did not refile his motion until a year later, just 12 days before the date set for trial. Without conducting an evidentiary hearing, the district court denied Williams's motion to admit the evidence on the merits, determining that the evidence lacked relevance

Supreme Court
OF
Nevada

(0) 1947A

unless and until the State opened the door at trial by arguing the girls could not make up a story because they are sexually innocent. This was error.

Under *Summitt v. State*, a defendant may show that an alleged victim has experienced specific incidents of sexual conduct such that the alleged victim has the experience and ability to contrive sexual allegations against the defendant. 101 Nev. 159, 163-64, 697 P.2d 1374, 1376-77 (1985) (construing the rape shield law to create "the least possible interference" with its purpose but also to uphold a defendant's Sixth Amendment right to present witnesses and confront witnesses against him). In *Summitt*, the defendant was accused of sexually assaulting a six-year-old girl and sought to present evidence of the victim's prior sexual experiences to show that she had prior independent knowledge of similar acts. *Id.* at 160, 697 P.2d at 1375. The district court determined that Nevada's "rape victim shield law," which prevents the use of a victim's previous sexual experiences to attack the victim's credibility, barred the evidence. *Id.* (citing NRS 50.090). On appeal, the court held that the evidence of the victim's prior sexual experiences was admissible, because it "was offered to show knowledge of such acts rather than lack of chastity." *Id.* at 163, 697 P.2d at 1377. The court reasoned that the average juror would perceive the six-year-old victim as a sexual innocent, and "it is probable that jurors would believe that the sexual experience she describes must have occurred in connection with the incident being prosecuted; otherwise, she could not have described it." *Id.* at 164, 697 P.2d at 1377 (quoting *State v. Howard*, 426 A.2d 457 (N.H. 1981)).

Williams's theory of defense was that the girls fabricated their allegations of sexual conduct because they were upset with Williams and wanted to get him out of the house. To establish that defense, Williams

sought to present evidence to rebut any assumption a juror may have that the 10- and 12-year-old girls could not have described the sexual acts they accused Williams of performing without having actually experienced those acts with Williams. *Summitt* does not, as the district court did in this case, require that the State open the door to such evidence by arguing that the victim is sexually innocent. Thus, the district court erred when it categorically excluded evidence of the girls' mother's sex-related activities in the home on the basis that the evidence lacked relevance.

*Summitt* recognizes that a jury may assume that a young victim is sexually innocent and lacks the knowledge to fabricate sexual allegations. *Id.* The girls' exposure to pornographic materials in the home tends to make it more likely that they could fabricate specific details of a sexual encounter without having actually experienced the encounters they described with Williams. *See* NRS 48.015 ("'[R]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."). Williams sought to introduce the evidence to show the girls' knowledge of sexual acts, not to impugn their character or that of their mother.

A legitimate question remains as to whether the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." NRS 48.035(1). The State notes that Williams's proffered evidence lacks the probative value the evidence did in *Summitt*. At ages 10 and 12, T.H. and A.H. are older than the 6-year-old in *Summitt*, making it less likely a juror would assume sexual innocence. Also, Williams did not seek to introduce evidence of prior sexual assaults as the defendant did in *Summitt*, but just

 

exposure to information about sex generally. Last, the State argues that the introduction of the mother's employment would result in unfair prejudice, trigger the jurors' emotions, and unfairly give the impression that the girls grew up in a depraved environment. Under *Summitt*, and the procedure set forth below, these arguments raise appropriate concerns and form a necessary part of the analysis. The district court should have weighed the probative value of the evidence against the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence. *See* NRS 48.035.

*Summitt* recognized that when a defendant moves to admit evidence to show that a young victim has the knowledge to contrive sexual allegations, a district court should afford the defendant an opportunity, outside the jury's presence, to show that "due process requires the admission of such evidence because the probative value in the context of that particular case outweighs its prejudicial effect on the [victim]." *Summitt*, 101 Nev. at 163, 697 P.2d at 1377 (quoting *Howard*, 426 A.2d at 461). In *Guitron v. State*, the Nevada Court of Appeals set forth a procedure for such an opportunity, which we now adopt. 131 Nev. at 215, 228, 350 P.3d 93, 101 (Ct. App. 2015) (setting procedure "for submitting and admitting or denying evidence of a victim's prior sexual knowledge" under *Summitt*).

When seeking to offer evidence to show that a young victim has the knowledge to contrive sexual allegations, the defendant must first make an offer of proof as to the evidence the defendant seeks to admit at trial. *Id.* Next, the district court should conduct a hearing. At the hearing, the defendant "must present justification for admission of the evidence, detailing how the evidence is relevant to the defense under the facts in the

case." *Id.* The State then should be given the opportunity to respond by showing how the evidence lacks sufficient probative value to overcome the risk of unfair prejudice, confusion of the issues, or misleading the jury its introduction will entail. The district court should then determine whether the evidence is relevant and, if so, weigh the probative value of the evidence against its prejudicial effect as required by NRS 48.035. *Id.* In particular, the district court should focus on "whether the introduction of the victim's past sexual conduct may confuse the issues, mislead the jury, or cause the jury to decide the case on an improper emotional basis." *Summitt*, 101 Nev. at 163, 697 P.2d at 1377. Finally, the district court should state, on the record, its findings of fact and conclusions of law as to what evidence is admissible, and what evidence is inadmissible. *Guitron*, 131 Nev. at 228, 350 P.3d at 101. This ensures that there is an adequate record to meaningfully review the issue on appeal. *See id.*

On remand, if Williams attempts to offer this evidence again, the district court should engage in this analysis to determine whether to allow Williams to present evidence to show that T.H. and A.H. had the knowledge to contrive sexual allegations without having experienced the sexual acts with Williams. The district court may find it appropriate to examine the girls under oath to help determine the probative value of allowing Williams to present evidence of the girls' mother's career and the sexual information available to the girls in the home.

****

The district court erred by denying Williams's *Batson* challenge, and in determining whether to admit or exclude evidence to show that the young victims had the knowledge to contrive sexual allegations.

SUPREME COURT
OF
NEVADA

(O) 1947A

Therefore, we reverse the judgment of conviction and remand to the district court for proceedings consistent with this opinion.

_Pickering_ , J.

Pickering

We concur:

_Douglas_ , C.J.

Douglas

_Cherry_ , J.

Cherry

_Gibbons_ , J.

Gibbons

_Hardesty_ , J.

Hardesty

_Parraguirre_ , J.

Parraguirre

_Stiglich_ , J.

Stiglich