136 Nev., Advance Opinion 38

IN THE SUPREME COURT OF THE STATE OF NEVADA

JEMAR DEMON MATTHEWS,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 77751

**FILED**

JUL 09 2020

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of three counts of attempted murder with the use of a deadly weapon, two counts each of robbery with the use of a deadly weapon and assault with the use of a deadly weapon, and one count each of conspiracy to commit murder, first-degree murder with the use of a deadly weapon, possession of a short-barreled rifle, and conspiracy to commit robbery. Eighth Judicial District Court, Clark County; Michelle Leavitt, Judge.

*Reversed and remanded.*

Leventhal & Associates, PLLC, and Todd M. Leventhal, Las Vegas,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Charles W. Thoman, Chief Deputy District Attorney, and John L. Giordani, III, Deputy District Attorney, Clark County,
for Respondent.

---

BEFORE GIBBONS, STIGLICH and SILVER, JJ.

*OPINION*

By the Court, SILVER, J.:

This court has repeatedly emphasized the importance of the district court clearly explaining its determinations and reasoning under the

20-25293

framework set forth in *Batson v. Kentucky*, 476 U.S. 79 (1986), when ruling on an equal protection objection to the use of a peremptory challenge to remove a veniremember. A clear record of the district court's determinations and reasoning is particularly important when the explanation for the peremptory challenge depends on the veniremember's demeanor, as the district court is uniquely positioned to observe that demeanor. While this court is primed to afford the district court's decision great deference, we cannot do so if the district court does not engage in the sensitive inquiry required under *Batson* and explain its conclusions. That is the case here. We are faced with a record that is devoid of any findings regarding the credibility of the State's demeanor-based explanation for its peremptory challenge of an African-American veniremember. Although the State also offered nondemeanor explanations for the peremptory challenge, those explanations are belied by the record. Under these circumstances, we cannot help but conclude that, based on the record, it is more likely than not that the State used the peremptory challenge for impermissible reasons. We therefore must reverse the judgment of conviction and remand for a new trial.

## FACTS

Appellant Jemar Matthews faced multiple charges related to a 2006 shooting. During jury selection, the State exercised one of its peremptory challenges to remove prospective Juror No. 342, an African-American woman. Matthews made a *Batson* objection, claiming that the peremptory challenge was based on Juror 342's race. The State then proffered its reasons for the challenge, referring to Juror 342's demeanor in responding to certain questions and the substance and forcefulness of her answers to certain questions:

[Prosecutor #1]: She gave very tenuous responses when asked about being fair and impartial. And I don't know if she verbally came across that way, but [Prosecutor #2] and I noted on at least two occasions that she kind of hesitated and rolled her eyes, and I think I even commented about that and tried to dig in a little further. Do you have more?

[Prosecutor #2]: And in comparison to the people who are in the 14 right now, even a comparison to [prospective Juror No. 348] who said unequivocally on two or three separate occasions that he could be fair they're very forceful in their answers.

I noted that she hesitated when you asked, Your Honor, if there was any reason she could be— she could not be fair or impartial. And also during [Prosecutor #1's] questioning she hesitated, and then during, I believe it was [defense counsels'] questioning, concerning about the criminal justice system she was just very—she equivocated a lot, so.

Matthews' counsel responded that he had noticed a lot of veniremembers rolling their eyes, looking down, nodding in agreement or disagreement, and the State countered that Juror 342's demeanor was more concerning:

[Prosecutor #1]: I look for those things too, and I clearly saw those with [Juror 342] in our questioning. I have a—when asked, any reason why you wouldn't be fair or impartial, she kind of sighed and said, no, dot dot dot dot dot and I saw that on numerous occasions.

So although I bantered with her and tried to get more out of her, I don't think I actually did get more explanation as to why she sighed so much, but I just don't want her on the jury for that reason because there is some hesitation about fairness which is the only thing that matters at this point.

The district court summarily overruled Matthews' objection, without making any specific findings or explaining its reasoning.

SUPREME COURT
OF
NEVADA

(O) 1947A

## DISCUSSION

It is well-established that the use of a peremptory challenge to remove a veniremember based on race violates the Equal Protection Clause of the United States Constitution. U.S. Const. amend. IV; Nev. Const. art. 4, § 21; *Batson*, 476 U.S. at 86; *see also Diomampo v. State*, 124 Nev. 414, 422, 185 P.3d 1031, 1036 (2008). Courts evaluate an objection to a peremptory challenge under *Batson* using a three-step framework. *See Batson*, 476 U.S. at 93-100; *see also Kaczmarek v. State*, 120 Nev. 314, 332-35, 91 P.3d 16, 29-30 (2004). Those steps consist of (1) the opponent of the peremptory challenge making a prima facie showing that the challenge was based on race; (2) if the prima facie showing is made, the proponent presenting a race-neutral explanation for the peremptory challenge; and (3) the district court hearing argument and determining whether the opponent has proven purposeful discrimination. *Williams v. State*, 134 Nev. 687, 689, 429 P.3d 301, 305-06 (2018).

Matthews and the State concede that steps one and two are not at issue. Step one is moot because the State gave its race-neutral reasons for the peremptory challenge before the district court determined whether Matthews made a prima facie showing of discrimination. *Id.* at 690-91, 429 P.3d at 306-07. And the State asserted race-neutral reasons for the peremptory challenge, thus satisfying step two. *See id.* at 691, 429 P.3d at 307 (recognizing that explanations for the peremptory challenge do not need to be persuasive or plausible at step two, just race-neutral). We therefore focus on step three.

At step three, a "district court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available and consider all relevant circumstances before ruling on a *Batson*

objection and dismissing the challenged juror." *Id.* (internal quotation marks omitted). "The court should evaluate all the evidence introduced by each side on the issue of whether race was the real reason for the challenge and then address whether the defendant has met his burden of persuasion." *Kaczmarek*, 120 Nev. at 334, 91 P.3d at 30. Because the district court's decision at step three "often turns upon the demeanor of the prosecutor exercising the strike, and the demeanor of the juror being struck— determinations that lie uniquely within the province of the district judge," *Williams*, 134 Nev. at 693, 429 P.3d at 308, this court has "repeatedly implored district courts to . . . *clearly spell out their reasoning and determinations*." *Id.* at 689, 429 P.3d at 306 (emphasis added). When the district court fails to do so, this court may not be able to give the district court's decision the deference that it would normally receive. *See id.* at 688, 429 P.3d at 305 (explaining that this court generally gives "great deference to the district court's finding" that "no unlawful discrimination occurred" but cannot do so when "the [district] court fails to properly engage [the three-step *Batson*] inquiry"); *Kaczmarek*, 120 Nev. at 334, 91 P.3d at 30 ("At the third step, especially, an adequate discussion of the district court's reasoning may be critical to our ability to assess the district court's resolution of any conflict in the evidence regarding pretext.").

The record before us does not show an analysis that comports with the requirements of step three. After allowing both sides to argue, with very little input from the bench, the district court simply said, "So at this time, the objection's overruled." When faced with a similarly concise conclusion in *Williams*, this court found that "the district court never conducted the sensitive inquiry required by step three." 134 Nev. at 693, 429 P.3d at 308 (quoting the district court as saying, "I don't find the State

based it on race"). Without an adequate step-three analysis, we held that the "record [did] not allow meaningful, much less deferential review." *Id.* Instead, we examined the record without any deference to the district court to determine whether the State's race-neutral explanations appeared pretextual. *Id.* at 693-96, 429 P.3d at 308-10. As in *Williams*, the district court's failure to articulate its reasoning or to make findings regarding demeanor or credibility makes it impossible for us to give its decision deference. We therefore are left to examine the cold record to determine whether the State's peremptory challenge of Juror 342 was more likely than not motivated by race. *See id.* at 688, 429 P.3d at 305 ("[W]here, as here, the court fails to properly engage [the three-step] inquiry, and it appears more likely than not that the State struck the juror because of her race, we must reverse and remand for a new trial.").

The parties appear to agree that the State provided both demeanor and nondemeanor explanations for the peremptory challenge. "[W]here only part of the basis for a peremptory strike involves the demeanor of the struck juror, and the district court summarily denies the *Batson* challenge without making a factual finding as to the juror's demeanor, [this court] cannot assume that the district court credited the State's demeanor argument." *Id.* at 693, 429 P.3d at 308 (citing *Snyder v. Louisiana*, 552 U.S. 472, 479 (2008)). That is the case here.[1] Accordingly,

---

[1]Without a finding by the district court, the cold record does not support the State's demeanor argument. *See Graves v. State*, 112 Nev. 118, 124, 912 P.2d 234, 238 (1996) ("The cold record is a poor substitute for demeanor observation."). In particular, the demeanor argument is based on physical cues and responses that are not apparent from the written record before us. And during the examination of Juror 342, the only mention of

we must focus on the State's nondemeanor explanations for the peremptory challenge in determining whether Matthews demonstrated purposeful discrimination. *See id.* at 694-96, 429 P.3d at 309-10 (focusing on the State's nondemeanor explanation for a peremptory challenge when the State also offered a demeanor explanation but the record did not allow the court to assume that the district court had credited the demeanor argument or based its decision on that argument). And as we have held, "[a] race-neutral explanation that is belied by the record is evidence of purposeful

---

her demeanor was when one of the prosecutors said he observed her smirking in response to a question about the criminal justice system. But even that observation does not support the State's later explanation of its peremptory challenge—that Juror 342 rolled her eyes, hesitated, and sighed during questioning. *See Snyder*, 552 U.S. at 477 (requiring an evaluation of "whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor").

During oral argument, the State asked this court to review the juror's demeanor as depicted in the video recording by the JAVS system. The State's request was improper for two reasons. First, neither party moved to transmit the JAVS recording and make it a part of the record on appeal. *See generally* NRAP 10(b)(2). We remind counsel that this court "cannot consider matters not properly appearing in the record on appeal" and that "[w]e have no power to look outside of the record of a case." *Carson Ready Mix, Inc. v. First Nat'l Bank of Nev.*, 97 Nev. 474, 476, 635 P.2d 276, 277 (1981) (internal quotation marks omitted). Second, the State's request asks this court to place itself in the role of the district court and to make a credibility determination the district court did not make, on an issue that "lies peculiarly within a trial judge's province." *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (internal quotation marks omitted); *see also Snyder*, 552 U.S. at 477 (recognizing the lower court's "pivotal role in evaluating *Batson* claims" and the significance of the lower "court's firsthand observations" regarding demeanor).

discrimination." *Conner v. State*, 130 Nev. 457, 466, 327 P.3d 503, 510 (2014).

The first part of the State's nondemeanor explanation was that Juror 342 gave tenuous responses about being fair and impartial. Juror 342 answered "[n]o" to the district court's general question asking if there was any reason she could not be fair and impartial. Twice the district court asked if anything from Juror 342's previous experiences—her serving as a juror in a civil trial or her father's murder—would affect her ability to be fair and impartial, to which she responded "[n]o." When the State asked if her father's murder caused her concern or should cause either side concern, she answered "[n]o." When defense counsel asked Juror 342 how her experiences would make her a good juror, she said, "Well, I know I'll be fair. I'll be fair to all the information I receive." Lastly, defense counsel asked Juror 342 if she would want herself as a juror if she were a defendant, and she responded "[y]es." This record belies the State's explanation that Juror 342's responses were tenuous.

The second part of the State's nondemeanor explanation was that Juror 342 answered questions about her ability to be fair and impartial less forcefully than other veniremembers.[2] But Juror 342's response to the court's general question about there being any reason why she could not be fair and impartial—a simple "no"—was identical to the responses given by

---

[2]The State's explanation invites comparative juror analysis. Unfortunately, neither side dove into a detailed, specific comparative juror analysis in the district court. Although doing so for the first time on appeal presents some difficulties and limitations, *Nunnery v. State*, 127 Nev. 749, 784 n.17, 263 P.3d 235, 258 n.17 (2011), we find it appropriate to conduct that analysis in considering whether the record supports the State's nondemeanor explanation for the peremptory challenge.

10 other veniremembers who were eventually seated on the jury, while 2 others answered, "[n]ot at all" and "I do not. I'm good . . . ." As to specific inquiries into relationships or previous experiences that could affect the ability to be fair and impartial, many of the seated jurors answered exactly as Juror 342 did. For example, Juror 354 answered "[n]o" after disclosing his brother was a corrections officer and after revealing previous jury experience, Juror 246 answered "[n]o" after revealing previous jury experience, Juror 271 answered "[n]o" after revealing a previous conviction, and Juror 381 answered "[n]o" after revealing he was the victim of a previous home invasion. Some seated jurors arguably offered more detailed answers about their ability to be fair,[3] but the substance of those answers appears very similar to Juror 342's response—"[w]ell, I know I'll be fair. I'll be fair to all the information I receive." We conclude the State's argument that Juror 342 gave tenuous responses about being fair and impartial, answering less forcefully than others, is not supported by the record and thus appears pretextual.

The State also suggested that Juror 342 equivocated in her answers about the criminal justice system. The following exchange between the prosecutor and Juror 342 provides the relevant context:

> [Prosecutor #1]: Okay. What is your feeling, ma'am, on the [criminal justice] system in general? You've heard all of the questions I've asked.

---

[3]For example, Juror 266 said, "I just want to hear the facts and make a decision based off of that." Juror 271 commented, "I think I can be fair. Absolutely. I'd be fair to everybody." "I'm very open-minded." Juror 284 proclaimed, "I'm fair. . . . I'm open-minded. I don't lean towards one side. When I'm presented the facts I'll make my decision based on the facts." And Juror 299 explained, "I would be fair. . . . [And fair means] [t]hat you listen to all aspects of the case and then you judge it by everything you've seen."

[Juror 342]: Well, yeah, somebody—a jury trial, I think it's fair.

[Prosecutor #1]: Okay.

[Juror 342]: A jury trial.

[Prosecutor #1]: All right. What about the—the entire system? Uh-oh. Was that a loaded question?

[Juror 342]: Yes.

[Prosecutor #1]: All right.

[Juror 342]: I thought we were going to stick to the jury trial.

[Prosecutor #1]: Well, no. Because you gave that smirk when I did it, so now I knew I had to ask. So I have to know.

[Juror 342]: No, I—I was just teasing. Yeah. I think it's pretty fair.

[Prosecutor #1]: Okay. Pretty fair, not perfect?

[Juror 342]: Pretty fair.

Defense counsel asked Juror 342 to explain what she meant by "pretty fair," and she explained, "I mean that I'm a little shaky about the system, you know, I just feel like there's—sometimes it's good sometimes it's bad some— you know, it's—it is what it is." Defense counsel asked if the system was "still the best," and Juror 342 answered "[y]es."

The State argues Juror 342's response shows she was doubtful as to the fairness of the criminal justice system and points to the responses of other veniremembers who were seated to demonstrate the uncertainty. However, others expressed similar observations: one commented that he would "probably say [the system is fair] 80 percent of the time"; another said, "Yeah, [the system is fair] for the most part."; yet another described the system as "about as good as it can get, you know. It's not 100 percent, of course." "But you know, overall, it's well."; and still another opined that

SUPREME COURT
OF
NEVADA

(O) 1947A

the system is "[k]ind of fair. It just depends on the situation I would say." "[B]ut I feel like minorities have it a lot worse than white people" when it comes to sentencing. Juror 342's response does not read as distinguishable from others who were not challenged; therefore, we conclude the State's explanation that Juror 342 equivocated in her answers about the criminal justice system suggests pretext.

Because the record significantly belies the State's nondemeanor explanations for using a peremptory challenge on Juror 342, thus indicating the explanations were pretextual, and because the district court did not fully engage in the sensitive inquiry and consideration required at step three in the *Batson* analysis, we conclude the district court clearly erred in denying Matthews' *Batson* objection. This constitutes structural error, *Williams*, 134 Nev. at 696, 429 P.3d at 310, and we therefore are left with no choice but to reverse the judgment of conviction and remand this matter for a new trial.[4]

_____, J.
Silver

We concur:

_____, J.
Gibbons

_____, J.
Stiglich

_____

[4]Given our disposition, we do not reach the merits of Matthews' remaining claims.